OPINION
{¶ 1} Defendant-appellant, Kristoffer T. Morris, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} This case arises from shootings, which occurred on July 12, 2004, in Franklin County, Ohio, that resulted in the death of Clifford Shortridge, Jr., and Russell Bonner, and the wounding of Clifford Shortridge, Sr. On July 22, 2004, the Franklin County Grand Jury indicted defendant on 22 counts, and defendant was ultimately tried on the following 12 renumbered counts: one count of aggravated burglary (count one); four counts of aggravated murder, all with death penalty specifications (counts two, three, *Page 2 
four, and five); three counts of attempted murder (counts six, seven, and nine); two counts of felonious assault (counts eight and ten); and two counts of having weapon under disability (counts 17 and 22). Counts one through ten contained firearm specifications. The jury trial commenced on August 8, 2005.
 {¶ 3} Glenna Shortridge ("Glenna"), the mother of Clifford Shortridge, Jr. ("Clifford, Jr."), and the wife of Clifford Shortridge, Sr. ("Clifford, Sr."), testified at trial as follows. On July 12, 2004, Glenna, Clifford, Sr., Clifford, Jr., her four other children, and a family friend, Russell Bonner ("Bonner"), were living at 1324 Brown Road in Franklin County, Ohio. Glenna testified that she had previously met defendant when he worked as a spot laborer for her husband's tree and landscaping company. Glenna denied that drugs were ever sold at her house or that stolen items were delivered to her house. Glenna saw defendant at her house at approximately 10 p.m., on July 11, 2004, talking to her husband. Defendant and another man entered the house and sat at the dining room table with Clifford Sr., where they ate some food prepared by Glenna. After approximately ten or 15 minutes, and no later than 11 p.m., defendant and the other man left the house.
 {¶ 4} Approximately two and one-half hours later, and while she and others were sitting on her front porch, Glenna saw a "tall, thin gentleman" walking northbound on Brown Road. (Tr. 200-201.) The tall, thin man crossed over in front of Glenna's house, and someone said, "Come on, Kris." (Tr. 203.) The man entered a vehicle and left the area. Minutes later, one of Glenna's dogs started to growl. Glenna's daughter, Raynae, walked around the corner of the house to investigate why the dog was growling. Raynae returned to the well-lit front porch screaming, "Oh, my God, Mom. Here comes guys, and *Page 3 
they have guns." (Tr. 216.) Glenna saw defendant and another man run up onto the porch. Bonner, who had been sitting on the porch with Glenna and others, ran into the house. Once on the porch, defendant stated, "What's up, motherfuckers." (Tr. 220.) Defendant pointed his gun at the persons on the porch. Glenna recalled one or two shots being fired before defendant and the other man arrived on the porch. Defendant entered the house, with the other man following him. Glenna ran in behind them, and grabbed her 13-year-old autistic, hearing-impaired son by the shirt and forced him out of the house. She turned around and saw Bonner being shot by defendant. The "shorter, chubbier" intruder was "froze," and Glenna "didn't see him doing anything." (Tr. 229.) Glenna testified that the shorter intruder's hands were to his side. Glenna ran out of the house and vomited. As she ran toward the back of the house, she heard gunshots coming from inside the house.
 {¶ 5} Glenna went back into the house and found Bonner lying on the dining room floor. Glenna tried to attend to Bonner, but she realized there was nothing she could do to save him. Glenna screamed for her kids and then she saw Clifford, Sr., in the hallway. He had blood coming out of both sides of his chest, and Glenna "told him to put his fingers in his holes" to stop the bleeding. (Tr. 242.) Glenna heard her two-year-old son screaming from the end of the hallway, and she went in that direction. She then found her son, Clifford, Jr., lying in the hallway. She screamed for help, and when the EMTs arrived, they determined that he was deceased.
 {¶ 6} Glenna testified that she began to correspond with inmate, and convicted murderer, Martin Scott ("Scott"), in the months after the shootings, when she was trying to determine whether defendant should receive a death sentence or life in prison. Scott and *Page 4 
Glenna developed a "pen-pal type * * * affair." (Tr. 305.) At the time, Glenna was drinking heavily and she felt that her marriage was over and her life was "destroyed." (Tr. 305.) The letters that Scott sent to her provided her with emotional support. Glenna denied that she had attempted to hire Scott to kill defendant if defendant was sent to prison for life and not given a death sentence. In December 2004, Clifford, Sr., learned of the relationship and filed for divorce. Glenna told Scott that the relationship had to stop because she did not want to lose her husband. Scott began sending threatening letters to Glenna. Scott had referred to Glenna "as his ticket to freedom." (Tr. 314.)
 {¶ 7} Clifford, Sr., testified at trial as follows. Defendant had worked for Clifford, Sr., as a spot laborer for his landscaping business. Approximately one week before the shootings, defendant purchased drugs from him. In another transaction, defendant sold what appeared to be stolen motorcycles to Bonner, who purchased the motorcycles with the aid of money loaned from Clifford, Sr. When the money for the motorcycles was exchanged, defendant saw the large amount of money Clifford, Sr., had in his possession. At one of the transactions, Clifford, Sr., demanded that defendant lift his shirt so Clifford, Sr., could see whether he was wired or undercover. Clifford, Sr., noticed a "distinctive tattoo" on defendant's stomach. (Tr. 345.)
 {¶ 8} Clifford, Sr., testified that, on the evening of July 11, 2004, defendant and Paul Speakman ("Speakman"), who Clifford, Sr., had previously met, arrived at his house. The three sat at the table and ate a meal, and defendant and Speakman offered to sell Clifford, Sr., some commercial lawnmowers. Clifford, Sr. rejected the offer. After Clifford, Sr., indicated his disinterest in the lawnmowers, defendant and Speakman left the house. Clifford, Sr., went to bed at approximately 11 p.m. and awakened at approximately 1 a.m. *Page 5 
and asked Glenna to get a Pepsi for him. Clifford, Sr., went back to sleep, but was awakened by gunfire. He opened the bedroom door, heard a loud bang, and saw defendant shooting to the east of the house, down the hallway. Clifford, Sr., testified that he said, "What the fuck are you shooting at, motherfucker?" (Tr. 365.) According to Clifford, Sr., defendant replied, "And I got one for you, too." (Tr. 368.) Defendant lifted his shirt to conceal his face, and Clifford, Sr., noticed the tattoo that he had previously seen on defendant. Defendant shot Clifford, Sr., as Clifford, Sr., was turning to go back into the bedroom. The bullet that struck Clifford, Sr., went through him and into the closet. After he was shot, Clifford, Sr., fell on the bed and said, "You killed me. You got me, motherfucker. You got me." (Tr. 373-374.) He heard someone screaming, "Come on, Kris. Come on, Kris. Let's get the fuck out of here, Kris. Let's get the fuck out of here, Kris." (Tr. 375.) Clifford, Sr., did not see Speakman at the time of the shootings. Clifford, Sr., took two guns and went out to the front porch and then the police arrived to secure the scene.
 {¶ 9} Jason Littler ("Littler"), a neighbor of the Shortridges on Brown Road, testified that, approximately between 2 and 3 a.m. on July 12, 2004, he saw two males, with something over their faces, quickly approach the front porch of the Shortridge house. He then heard, "What's up, motherfucker." (Tr. 1099.) After that statement, he heard Raynae and Glenna screaming. Within a few seconds he heard gunfire. According to Littler's testimony, he heard a couple gunshots, then a "bunch." (Tr. 1101.) After the initial gunshots, he heard "big Cliff say "You got me[.]" Id. At that point in time, Littler went into his house and called 911. Littler testified that the gunshots initially sounded like *Page 6 
they were coming from the front of the Shortridge house, and then the final shots sounded like they were coming from the back of the house.
 {¶ 10} Corporal William Cox of the Franklin County Sheriff's Office arrived at 1324 Brown Road within a few minutes after the shootings. Glenna directed Corporal Cox to her house. After entering the house, Corporal Cox found the victims, who were motionless, but he did not see any assailant. He asked Glenna if she knew who committed the crimes, and she responded, "Kris Morris." (Tr. 535.)
 {¶ 11} Special Agent Douglas Caplinger of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), arrived at the scene of the shootings at approximately 5:20 am, on July 12, 2004. Agent Caplinger observed two bodies at the scene, and he photographed the scene. In processing the scene, Agent Caplinger recovered multiple bullet fragments and spent casings. Specifically, he recovered one spent casing outside the house at the corner of Little Avenue and Brown Road. Inside the house, he recovered three live cartridges, nine spent casings, and five spent bullets and bullet fragments. Agent Caplinger also processed two vehicles in connection with the investigation: a 1999 Nissan Altima, which belonged to Kimberly Repede ("Kimberly"), and a 1997 Chrysler Sebring, which belonged to Staci Gilcrest ("Staci"). He found an unloaded magazine for a 9-millimeter pistol in the trunk of the Chrysler and two live cartridges in the floorboard area of the driver's side of the Nissan.
 {¶ 12} Kimberly, who was with defendant on the night of the homicides, testified at trial as follows. She met defendant during Memorial Day weekend in 2004, and the two were dating as of July 11, 2004. She was with defendant when he sold stolen dirt bikes to Clifford, Sr., for money and drugs. She identified the 1999 Nissan Altima as her *Page 7 
vehicle. On July 11, 2004, Kimberly, defendant, and Erica Smith ("Erica") met at Kimberly's house in Dublin, and they made plans to go to a bar and drink. They left the house in Kimberly's Altima and went to pick up Speakman at his house in Grove City. After picking up Speakman, they drove to the Shortridge house to buy Xanax. Upon arrival, defendant and Speakman went into the Shortridge house for approximately five to ten minutes. Kimberly and Erica stayed in the vehicle.
 {¶ 13} They proceeded to go to the "Front Row Tavern" in Grove City, where they drank and played pool. Kimberly took Xanax that defendant gave her. According to Kimberly, defendant and Speakman were also taking Xanax, but Erica was not taking the drug. Kimberly and defendant got into an argument and defendant punched her in the mouth. Kimberly described defendant as being "very hyped up and drunk and high" at that point in time. (Tr. 617.) After defendant punched Kimberly, they got into her vehicle and defendant drove to a church parking lot on Brown Road, which is across the street from the Shortridge house. Defendant parked the vehicle so its front end was facing the street.
 {¶ 14} After parking, defendant got out of the vehicle. Erica and Staci arrived with Speakman, and Speakman got out and started to talk with defendant. Defendant told Kimberly to get into the driver's seat and keep the vehicle on. Kimberly observed defendant and Speakman put on defendant's clothes from the trunk of her vehicle, and she saw defendant and Speakman place guns in their pants and run across the street. Subsequently, she heard approximately ten to 13 gunshots, and within seconds she saw defendant and Speakman running back to the vehicles. Defendant got into Kimberly's vehicle and said, "Go." (Tr. 629.) *Page 8 
 {¶ 15} They left the church parking lot, headed south, and arrived at "Collier Park." At Collier Park, defendant and Speakman got out of the vehicles, and defendant, who still had his gun, "fired shots" and talked about how he "wanted to go out and do more." (Tr. 630.) Defendant got back into the vehicle with Kimberly and, at some point, the two looked for a gun that defendant had thrown out the window. Defendant dropped Kimberly off at her house and went back out with her vehicle.
 {¶ 16} Later that day, Kimberly went to classes at Columbus State. After the classes, she was surrounded by police officers. She agreed to help the police find the gun, and they searched different areas for the gun. When she was with the police, defendant called her cell phone multiple times, and she put defendant on speakerphone so Detectives McDowell and McMillin could hear him. One of the calls was recorded. The recording of the call was played at trial. On the recording, defendant and Speakman attempted to direct Kimberly to their location. At one point, defendant asked her where she was located, and she responded that she did not know the name of the apartments. Defendant told her to go look at the sign, and she responded, "[t]here was no sign." Defendant then stated, "I bet they're watching those entrances." (Tr. 643.)
 {¶ 17} Staci Gilcrest testified at trial as follows. On July 11, 2004, Staci went to the Front Row bar to meet her friend, Erica Smith, who was at the bar with defendant, Kimberly, and Speakman. She admitted that she took Xanax and drank at the Front Row bar that evening. At some point in time, Staci, Erica, defendant, Kimberly, and Speakman, left the bar in Staci and Kimberly's vehicles. She recalled the group parking the vehicles in a church parking lot, and she was "feeling a little woozy" at the time. (Tr. 695.) When they stopped, Speakman was looking through Erica's clothing in the back *Page 9 
seat for a long-sleeved shirt. Staci saw defendant and Speakman going through the trunk of Kimberly's vehicle, and then she passed out for a period of time. After that, she heard loud noises and then defendant and Speakman "running from across the street." (Tr. 700.) She remembered going to Collier Park, where Speakman "shove[d] pills down [her] throat." (Tr. 702.)
 {¶ 18} Erica Smith testified that when she, Kimberly, and defendant were talking about what they were going to do that evening, and defendant joked that "[s]ome shit's going to go down tonight. How do you all feel about moving to Mexico?" (Tr. 719.) According to Erica, they laughed at that statement. After they left the apartment in Kimberly's vehicle to pick up Speakman, defendant called Clifford, Sr., and stated, "I'm coming to pick up some pills. Those pills you gave me the other day weren't what you said they were. I want some Xanax." (Tr. 722.) Erica testified that a couple days before July 11, 2004, defendant had indicated to her that he wanted to "set up" Clifford, Sr., in order to rob him. (Tr. 724-725.)
 {¶ 19} When they arrived at the Shortridge house, defendant and Speakman went inside for a few minutes and returned with Xanax. They proceeded to go to the Front Row bar. Erica saw defendant and Kimberly get into a fight and she saw defendant bite Kimberly's lip and punch her in the face. Defendant walked around the shopping center near the bar and retrieved his gun out of Kimberly's vehicle. Defendant approached Kimberly's vehicle and said to Erica, "You're fucking taking me to that house. I'm going to go fucking rob that dude." (Tr. 737.) Erica refused. Defendant told her to get in the backseat because he was going to drive and pointed the gun at her. Erica got out of the vehicle and went to Staci's vehicle, and they drove to the area of the Shortridge house. *Page 10 
 {¶ 20} Erica saw defendant walking down the street with a brown or tan bandanna on his face and a gun in his hand. Speakman got out of Staci's vehicle and talked with defendant. Speakman got back into Staci's vehicle, and they parked the vehicle in a church parking lot near Kimberly's vehicle. After they parked, Speakman got out of the vehicle and spoke with defendant. Staci, Erica, and Kimberly remained in the vehicles. Both defendant and Speakman had a gun. Erica indicated to Speakman that she and Staci wanted to leave. He responded, "You motherfuckers aren't going nowhere," and he pointed the gun at the vehicle. (Tr. 753.) Defendant and Speakman then ran through the bushes, and approximately one minute and 30 seconds later Erica heard 10 to 14 shots fired. "Almost immediately" after the gunfire stopped, Erica saw defendant and Speakman running. (Tr. 754.)
 {¶ 21} The two men got back into the vehicles and the group drove to Collier Park, which is an apartment complex, and defendant said "he wanted to go rob some Mexicans that lived there." (Tr. 756-757.) Speakman indicated to defendant that they did not have enough bullets, and defendant responded, "We'll make the girls go buy some more." (Tr. 757.) Defendant fired his gun one time at Collier Park.
 {¶ 22} Johnetta Jessee ("Johnetta"), who resided at the Wind Rush apartment complex, testified at trial as follows. Johnetta knew Speakman because she had lived near his father, and she also knew defendant. On July 12, 2004, defendant and Speakman arrived at her apartment at the Wind Rush complex. According to Johnetta, defendant was "[a]ntsy, nervous, hyper, loud," and he had two handguns. (Tr. 1116.) Johnetta testified that defendant said "he done killed down on Brown Road, that he would — them MF-ers on Brown Road. He would kill me. Now, be quiet." (Tr. 1117.) *Page 11 
Defendant showed her a fake passport ID and indicated to her that they were waiting to get Speakman's before they could leave the country. Defendant called Speakman to ask for a bulletproof vest. Defendant stated that he wanted to go rob two more places. Defendant and Speakman left the apartment, and shortly thereafter Johnetta heard gunshots.
 {¶ 23} Lieutenant Michael Spiert, of the Franklin County Sheriff's Office, testified at trial. On July 12, 2004, Lieutenant Spiert, who was working special duty and was in plain clothes, was directed to go to the Central Point Shopping Center. Upon arrival, he was told to search for two suspects, who were dressed in black, at the Wind Rush apartment complex. He drove, in an unmarked vehicle, through the apartment complex, and as he exited the complex, he saw two individuals dressed in black crouched behind a wall. Trying not to be noticed, Lieutenant Spiert continued out of the complex and pulled into a business parking lot and radioed that he had seen the suspects. An arrest team was assembled. At some point, instructions were given to move in and apprehend the suspects. As Lieutenant Spiert proceeded to the north entrance of the apartment complex, he heard a gunshot. Detective McMillin radioed that he was being shot at. Lieutenant Spiert followed one of the detectives toward the back of the apartment complex, where he saw an article of clothing hanging from a large fence and a handgun in the grass near the fence. He radioed for assistance in setting up a perimeter around a wooded area near the fence. He then heard a gunshot nearby. Shortly thereafter, Speakman was found dead, from a self-inflicted gunshot wound, in a patio area of an apartment. Columbus Police Officer Eric Everett testified that defendant was apprehended near a creek bed approximately one mile from the Wind Rush apartments. *Page 12 
 {¶ 24} After the shootings at the Shortridge house, but before defendant's apprehension, Detectives Robert McMillin and Larry McDowell, both of the Franklin County Sheriff's Office, were directed to take Kimberly to the area of Brown Road to search for a handgun. As they were searching, Kimberly received a phone call from defendant. Kimberly placed the call on speakerphone to enable the detectives to hear defendant. Detective McMillin testified that defendant "threatened if she brought the cops to him, that he would kill her and kill her entire fucking family as well as he'd already killed two other motherfuckers, and he could do more." (Tr. 932.) Detective McMillin added, "It's not direct quotes, but words to that effect." Id. Detective McDowell also testified that defendant indicated that he would kill Kimberly and her family if she was with the police, and that defendant stated, "I've already killed two motherfuckers, and I'll kill more." (Tr. 989.) During another phone call, which Kimberly also placed on speakerphone, Kimberly asked defendant where the handgun that he had used was located, and, according to Detective McMillin, defendant responded, "Don't worry about it. I've got the fucking gun." (Tr. 936.) Defendant made more threats to Kimberly and indicated that they were waiting for her at the Wind Rush apartments.
 {¶ 25} Detectives McMillin and McDowell arrived at Central Point Shopping Center with Kimberly and were informed of the plan to apprehend the suspects. The detectives left Kimberly at that location with other officers, and proceeded to an area near the Wind Rush apartments. At some point, the detectives were directed to go into the apartment complex. After they turned into the complex, with their vehicle headlights off, they saw a white male, who was wearing black clothing, walk toward them waving his arms and whistling at the vehicle. Detective McDowell turned on the lights and they recognized *Page 13 
defendant from photographs they earlier had reviewed. The detectives confronted him at gunpoint and told him to freeze and lift his hands. Initially, defendant complied by lifting his hands. However, he then dropped his hands and fled. Detective McMillin pursued him by foot.
 {¶ 26} Detective McMillin testified that, shortly after the foot pursuit began, there was "a gunshot fired at us by Mr. Morris." (Tr. 946.) Detective McMillin further testified:
 When we first made contact with him, I did not see any weapons. When he was running, fleeing from us, and we initially start to pursue, the shot is fired in a manner like this at us. He didn't stop, take aim or anything. He was running, hanging the handgun back over behind him and fire. I saw a muzzle flash from the weapon.
(Tr. 946.) The prosecutor then asked the following question: "So as you say, he doesn't stop; but he turns while he's running and fires a shot?" Id. Detective McMillin answered, "Yeah, he's basically running away from us, but turns in that direction. You know, we're pursuing, coming up this way. He turns back, and I see a muzzle flash from a weapon." Id. At the time he fired the shot, defendant was "running at a high rate of speed." (Tr. 959.) On cross-examination, Detective McMillin further testified regarding the gunshot that occurred when defendant was fleeing:
 Q. Now, I believe you testified that when you began your pursuit, there was a shot fired, and I think you made some kind of motion like turning over the shoulder?
 A. And firing, right. There was — there was — there wasn't a aimed shot at us. As he was fleeing at a high rate of speed, there was a shot fired in that manner.
 Q. Okay. And I believe your exact words were: "He never took aim"; is that accurate?
 A. Yeah. In saying that, I'm a firearms instructor. Not taking a shooting position, trying to aim at — *Page 14 
 Q. A target.
 A. — target, Detective McDowell. That's what I meant when I said a shooting position.
(Tr. 974.) Detective McDowell's testimony indicated that defendant fired the weapon over his shoulder as the detectives were pursuing him.
 {¶ 27} After the shot was fired, the detectives continued to pursue defendant. The detectives lost sight of defendant when he ran around the corner of an apartment building. They searched the area and then heard a gunshot. They found Speakman dead with a gun in his hand and another in his waistband.
 {¶ 28} Special Agent William Hatfield of BCI processed the scene at the Wind Rush apartments. At the apartment complex, agent Hatfield recovered a "Jennings Bryco" 9-millimeter semiautomatic pistol on the ground between apartment buildings, a "Taurus" .357 Magnum revolver as well as a "Ruger" semiautomatic 9-millimeter pistol near the body of Speakman, and a "Glock" 9-millimeter semiautomatic pistol near the stockade fence.
 {¶ 29} William Mark, a firearms examiner with the BCI, testified that the four weapons that were submitted for examination were found to be in proper working order. He opined that ten spent cartridge cases and four bullets recovered by Agent Caplinger from inside the Shortridge house and from the corner of Brown Road and Little Avenue were fired from the Ruger semiautomatic pistol, which was recovered at the Wind Rush apartments. He also opined that one spent cartridge case recovered inside the Shortridge house was fired from the Glock pistol, which was recovered at the Wind Rush apartments. *Page 15 
 {¶ 30} Patrick Fardal, M.D., testified regarding the autopsies performed on Russell Bonner and Clifford Shortridge, Jr. Dr. Fardal testified that he found six entrance gunshot wounds on Bonner's body. He further testified that Bonner suffered injury to multiple internal organs, including his left lung, abdominal aorta, his liver, his left kidney, and his small bowel, which caused him to bleed to death. Dr. Fardal testified that one gunshot entrance wound and one exit wound was found on the body of Clifford Jr. Dr. Fardal testified that Clifford, Jr. died as a result of a single gunshot wound, with injuries to his lungs and aorta, which caused him to bleed to death.
 {¶ 31} At trial, the parties stipulated that defendant had certain items on his person at the time of his arrest, including a knife, four live 9-millimeter bullets, a brown bandanna, a pair of black gloves, and a black wallet containing different identification cards. In addition, the parties stipulated that defendant was inside the Shortridge house at 1324 Brown Road at the time of the shooting, and that defendant did have a "distinctive tattoo" on his stomach as testified to by Clifford Shortridge, Sr. (Tr. 1203.)
 {¶ 32} Martin Scott was called as a witness on behalf of defendant. Scott testified that he is currently serving a 53-years-to-life prison sentence in Lucasville for murder. Scott became acquainted with Glenna Shortridge in late July or early August 2004, when she wrote a letter to him. Scott testified that Clifford, Sr., provided him with a synopsis as to what had occurred, and Scott offered to kill defendant in exchange for money and that Clifford, Sr., accepted the offer. Scott testified that Clifford, Sr., told him the following in a telephone conversation: "Listen, I'm going to be honest with you. * * * I didn't see Kris shoot anyone. Paul did it. But since that bitch killed himself, I'm going to blame it all on Kris." (Tr. 1219.) Scott admitted to sending hundreds of letters to Glenna. Scott testified *Page 16 
that, after Clifford, Sr., learned of Glenna's pen-pal relationship with Scott, Scott informed Clifford, Sr., that the deal to kill defendant was off the table. Scott testified that after Glenna ended their pen-pal relationship, he sent more mail to her, which was sent back to prison with the notation, "Return to sender." (Tr. 1228.)
 {¶ 33} At the conclusion of the trial, the trial court gave its instruction to the jury, which included an instruction on the issue of flight. The defense objected to the instruction given to the jury regarding defendant's flight.
 {¶ 34} The jury returned the following verdicts: as to count one, guilty of aggravated burglary, with a firearm specification; as to count two, not guilty of aggravated murder as charged, but guilty of the lesser-included offense of murder, with a firearm specification; as to count three, guilty of aggravated murder, with a firearm specification; as to count four, not guilty of aggravated murder as charged, but guilty of the lesser included offense of involuntary manslaughter, with a firearm specification; as to count five, not guilty of aggravated murder, but guilty of the lesser-included offense of involuntary manslaughter, with a firearm specification; as to count six, guilty of attempted murder, with a firearm specification; as to count seven, not guilty of attempted murder; as to count eight, guilty of felonious assault, with a firearm specification; as to count nine, not guilty of attempted murder; and as to count ten, guilty of felonious assault, with a firearm specification. In addition, as to count three, the jury found that defendant did not personally commit each act which constituted the aggravated murder, including firing the shot that caused the death of Russell Bonner, or commit the aggravated murder with prior calculation and design. Also as to count three, the jury found that the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or *Page 17 
more persons by the defendant. The trial court found defendant guilty of two counts of having a weapon under disability (counts 17 and 22).
 {¶ 35} A mitigation hearing began on August 22, 2005. On August 23, 2005, the jury determined that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt and recommended a prison sentence of 30 years to life.
 {¶ 36} The trial court filed its judgment entry of conviction and sentence on August 25, 2005, and an amended entry on September 14, 2005. By said entry, the trial court imposed the following sentence: 30 years to life as to count three, ten years as to count one, ten years as to count four, ten years as to count six with an additional three years for the use of the firearm, ten years as to count eight, ten years as to count ten with an additional three years for the use of a firearm, three years as to count 17, and three years as to count 22. The trial court merged the firearm specifications in counts one through six for purposes of sentencing, merged counts two and three as well as four and five for sentencing purposes, ordered that counts one, ten, 17 and 22 are to run concurrent with each other and all other counts, and ordered that counts three, four, six, and eight are to run consecutive to each other and the two firearm specifications. Therefore, the trial court imposed upon defendant a total prison sentence of 66 years to life.
 {¶ 37} Defendant timely appeals and sets forth the following three assignments of error for our review:
 ASSIGNMENT OF ERROR I
 Appellant's convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. *Page 18 
 ASSIGNMENT OF ERROR II
 The trial court commits reversible error for giving maximum consecutive sentences when there were no facts proven beyond a reasonable doubt to the jury to support giving non-minimum, consecutive sentences.
 ASSIGNMENT OF ERROR III
 The trial court commits reversible error when it gives a jury instruction that violates the defendant's right to remain silent under the state and federal constitutions.
 {¶ 38} Under his first assignment of error, defendant only challenges the sufficiency of the evidence as it relates to his convictions for aggravated murder (count three) and felonious assault (counts eight and ten). In addition, under his first assignment of error, defendant only challenges his convictions for murder, aggravated murder, and attempted murder (counts two, three, and six) as allegedly being against the manifest weight of the evidence.
 {¶ 39} In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 40} When assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine *Page 19 
"`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. A defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright, Franklin App. No. 03AP-470,2004-Ohio-677, at ¶ 11. Thus, this court must give great deference to the fact finder's determination of witnesses' credibility. See id. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387.
 {¶ 41} As noted above, defendant challenges the sufficiency of the evidence as to three of his convictions, namely, his aggravated murder and felonious assault convictions. Regarding his aggravated murder conviction, defendant sets forth arguments concerning the issues of whether he planned to kill anyone and whether he in fact personally shot and killed Bonner. Defendant asserts that the evidence demonstrated that Speakman was in possession of the 9-millimeter Ruger that killed Bonner. Defendant also argues that there is no evidence that he planned to kill. He essentially argues that, even if evidence supported a finding that defendant and Speakman planned to rob one of the Shortridges, there is no evidence that defendant planned to kill anyone. In addition, *Page 20 
defendant alludes to the theory that was set forth by his counsel at trial that Speakman "went nuts" inside the Shortridge house and shot Bonner.
 {¶ 42} In this case, the jury found defendant guilty of aggravated murder as alleged in the renumbered count three of the indictment. The renumbered count three of the indictment alleged that defendant, in violation of R.C. 2903.01, purposely caused the death of Russell Bonner, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated burglary. As noted by the state, the jury rejected the theory that defendant personally shot Bonner, in view of the verdict as to the death penalty specification as to count three. However, the evidence in this case supported a finding that defendant, acting with the kind of culpability required for the commission of the offense, aided and abetted in the purposeful shooting of Bonner.
 {¶ 43} Pursuant to R.C. 2923.03(A), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." "Whoever violates [R.C. 2923.03] is guilty of complicity in the commission of the offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). In order to support a conviction for complicity by aiding and abetting under R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson (2001), 93 Ohio St.3d 240,2001-Ohio-1336, syllabus. A defendant's "`[participation in criminal intent may be inferred from presence, companionship and conduct before and *Page 21 
after the offense is committed.'" Johnson, at 245, quoting State v.Pruett (1971), 28 Ohio App.2d 29, 34.
 {¶ 44} Defendant's presence at the Shortridge house at the time of the shootings was stipulated to by the parties. However, defendant was not simply present at the scene of the shootings. Testimony regarding defendant's conduct and statements before and after the shootings, along with other testimony regarding the circumstances of the shootings, supported a finding that defendant actively participated in the shooting death of Bonner at the Shortridge house, and that he shared the criminal intent of the principal.
 {¶ 45} Testimony at trial indicated that defendant and Speakman went to the Shortridge house during the evening on July 11, 2004, to purchase drugs and/or to attempt to sell lawnmowers. After they left the Shortridge house, the two went with others to a bar. Later that night, they all drove and parked their vehicles at a church near the Shortridge house. Evidence at trial indicated that defendant and Speakman, each armed with at least one gun, approached the Shortridge house in the early morning hours of July 12, 2004. Upon arriving at the Shortridge house, defendant pointed his weapon at those on the front porch of the Shortridge house. Shortly thereafter, Clifford, Jr., and Bonner were shot and killed, and Clifford, Sr., was shot and wounded.
 {¶ 46} Clifford, Sr., testified that defendant shot his weapon to the east of the house, down the hallway, and that, when he confronted defendant, defendant threatened him and then shot him. According to Clifford, Sr., defendant attempted to conceal his face with a bandanna and by lifting his shirt. Additionally, there was testimony that at least two different weapons were fired at the Shortridge house. In that regard, defendant concedes that the evidence at trial, when viewed in a light most favorable to the state, *Page 22 
demonstrated that he fired one shot while he was in the house. After the gunfire ceased, defendant and Speakman were seen running from the Shortridge house. They returned to the vehicles, which were parked at the church, and fled the area.
 {¶ 47} According to Kimberly Repede's testimony, after fleeing the scene of the shootings, defendant fired his weapon and said he "wanted to go out and do more." (Tr. 630.) In addition, before he was arrested, defendant made other statements implicating himself in the shootings. For example, when Kimberly was with detectives who were investigating the shootings, defendant told her that he had already killed two individuals and would kill more if she did not comply with his instructions. Defendant similarly threatened Johnetta Jessee before he was apprehended near the Wind Rush apartment complex.
 {¶ 48} Considering the evidence presented at trial, we find sufficient evidence showing that defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of aggravated murder, and that defendant shared the criminal intent of the principal in the purposeful killing of Bonner. Thus, the evidence at trial supported the jury's verdict finding defendant guilty of aggravated murder as alleged in count three.
 {¶ 49} In addition, defendant challenges his felonious assault convictions by arguing that there was insufficient evidence to convict him of those offenses. As pertinent here, R.C. 2903.11(A)(2) prohibits any person from knowingly attempting to cause physical harm to another by means of a deadly weapon. Defendant contends that, although the testimony of the detectives indicates that defendant fired over his shoulder, the testimony also indicated that he did not aim the weapon. Furthermore, defendant *Page 23 
notes that the testimony of Detective McDowell indicated that defendant was running at a "high rate of speed" when the shot was fired. (Tr. 974.) According to defendant, he did not aim the weapon, but simply fired a warning shot without any intention of causing physical harm with his weapon.
 {¶ 50} Although Detective McMillin did testify that defendant did not stop and take aim, the testimony at trial supported a finding that defendant fired the weapon over his shoulder at the pursuing detectives. Indeed, the testimony indicated that he did not stop and take aim because he was in the process of running at a "high rate of speed," or fleeing, from the police. Clearly, the evidence in this case supported a finding that defendant pointed the firearm in the direction of the pursuing officers and fired the weapon. Therefore, we find that the evidence at trial supported the finding that defendant knowingly attempted to cause physical harm to the detectives by means of a deadly weapon. Consequently, we conclude that the evidence was sufficient to support defendant's felonious assault convictions.
 {¶ 51} We also find as unpersuasive defendant's argument that his convictions for aggravated murder, murder, and attempted murder were against the manifest weight of the evidence. To support his manifest-weight argument, defendant contends that Glenna and Clifford, Sr., lacked any credibility. Defendant argues that Clifford, Sr., lied at trial because he wanted defendant to be convicted for Speakman's actions. Pursuant to that argument, Clifford, Sr., had a motive to lie about seeing defendant shoot him because Speakman, the real shooter, committed suicide and could not be brought to trial for his actions. Defendant challenges Clifford, Sr.'s credibility by citing evidence that the bullet that struck him was fired from a Ruger, which, according to defendant, was in *Page 24 
Speakman's possession. Furthermore, testimony of Martin Scott as to what Clifford, Sr., told him supports the contention that Clifford, Sr., was willing to lie to ensure defendant's conviction. Defendant also argues that Clifford, Sr., lied about his dealings in stolen property and drugs. Consistent with these arguments is defendant's contention that Glenna was untruthful at trial. Defendant, citing Glenna's letters to Scott, asserts that Glenna's denial that she tried to hire Scott to kill defendant was a lie. According to defendant, Glenna's lying supports a finding that he was not the person who shot Clifford, Sr., or Bonner.
 {¶ 52} "The trier of fact is free to believe all, part, or none of the testimony of each witness who appears before it." State v. Long (1998),127 Ohio App.3d 328, 335. Thus, even if the jury found parts of Clifford, Sr., and/or Glenna's testimony to be untruthful, or inconsistent with the physical evidence, it was within the province of the jury to believe other parts of their testimony and to resolve any evidentiary inconsistencies. In addition, the jury was free to believe other witnesses who testified regarding the circumstances of the shootings and defendant's conduct in relation to those shootings. Based on our review of the evidence, we cannot conclude that the jury clearly lost its way in resolving evidentiary conflicts and created such a manifest miscarriage of justice that defendant's convictions must be reversed and a new trial ordered.
 {¶ 53} Accordingly, we overrule defendant's first assignment of error.
 {¶ 54} In his second assignment of error, defendant contends that the trial court violated his Sixth Amendment right to a trial by jury by sentencing him to maximum and consecutive sentences, and that this case must be remanded for resentencing. *Page 25 
 {¶ 55} In support of this constitutional argument, defendant cites Supreme Court of the United States decisions in Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, and Apprendi v. NewJersey (2000), 530 U.S. 466, 120 S.Ct. 2348. In Apprendi, at 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Blakely, at 303, the United States Supreme Court, in applying the rule in Apprendi, held that the statutory maximum is "the maximum sentence a judge may impose solely on the basisof the facts reflected in the jury verdict or admitted by thedefendant." (Emphasis sic.)
 {¶ 56} On February 27, 2006, and during the pendency of this appeal, the Supreme Court of Ohio released State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856. In Foster, the Supreme Court of Ohio, followingBlakely and Apprendi, found portions of Ohio's felony sentencing scheme unconstitutional because those portions required judicial fact-finding in violation of a defendant's Sixth Amendment right to a trial by jury. The Foster court severed the unconstitutional provisions from Ohio's felony sentencing laws. Pursuant to Foster, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.
 {¶ 57} In addition, the Foster court concluded that cases pending on direct review "must be remanded to trial courts for new sentencing hearings." Id. at ¶ 104. In this regard, this court has recognized the "broad language the Supreme Court of Ohio used in *Page 26 
Foster when it ordered resentencing for all cases pending on direct review." See State v. Draughon, Franklin App. No. 05AP-860,2006-Ohio-2445, at ¶ 7. However, this court has also concluded that "a defendant who did not assert a Blakely challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on Foster." Id. In other words, "a Blakely challenge is waived by a defendant sentenced after Blakely if it was not raised in the trial court." Id. at ¶ 8.
 {¶ 58} Blakely was decided on June 24, 2004. In the case at bar, defendant's sentencing hearing occurred in August 2005. However, defendant's counsel did not raise error in the trial court on the basis of Blakely. Therefore, we conclude that defendant has waived hisBlakely challenge for purposes of this appeal. Furthermore, although defendant has not alleged plain error, we note that this court has declined to apply the plain error doctrine under these circumstances. See, e.g., State v. Jones, Franklin App. No. 06AP-734, 2007-Ohio-1466. Consequently, we overrule defendant's second assignment of error.
 {¶ 59} Defendant argues in his third assignment of error that the trial court gave an improper jury instruction on the issue of defendant's flight. Defendant argues that the jury instruction required him to testify in violation of his Fifth and Fourteenth Amendment rights under the United States Constitution and in violation of his right against self-incrimination as guaranteed by Section 10, Article 1, of the Ohio Constitution. The state argues that the trial court properly instructed the jury.
 {¶ 60} "When determining whether a trial court erred in its jury instructions, an appellate court reviews the instruction as a whole. * * * A trial court has broad discretion in instructing the jury." (Citations omitted.) State v. Orlandi, Franklin App. No. 05AP-917, *Page 27 2006-Ohio-6039, at ¶ 31. The jury is presumed to follow instructions given by the court. State v. Pena, Franklin App. No. 03AP-174,2004-Ohio-350, at ¶ 27, citing Pang v. Minch (1990), 53 Ohio St.3d 186, paragraph four of the syllabus.
 {¶ 61} As to defendant's flight, the court instructed the jury as follows:
 In this case, there is evidence tending to indicate that the defendant fled from the vicinity of the alleged crime. In this case, you are instructed that flight in and of itself does not raise a presumption of guilt. However, unless satisfactorily explained, it tends to show a consciousness of guilt or a guilty connection with the alleged crime. If, therefore, you find the defendant did flee from the vicinity of the alleged crime and this conduct has not been satisfactorily explained, you may consider the circumstances in the case in determining the guilt or innocence of the defendant. Upon you alone rests the decision to determine that weight, if any, you place upon the evidence you find, if any, which bears upon this issue.
(Emphasis added.) (Tr. 1375.) The trial court also instructed the jury as follows: "It is not necessary that the defendant take the witness stand in his own defense. The defendant has a constitutional right not to testify. The fact that the defendant did not testify must not be considered for any purpose." (Tr. 1347.)
 {¶ 62} In support of his argument that the instruction on flight violated his constitutional rights, defendant cites the Comment to § 405.25 of the Ohio Jury Instructions ("OJI"), which states as follows:
 Courts in Ohio have held that requiring the defendant to provide an explanation of the conduct by including in the instruction the phrase "unless satisfactorily explained" is unconstitutional and wrongfully places a burden upon the defendant. State v. Berry, Cuyahoga App. No. 83756, 2004-Ohio-5485; State v. Davilla, Lorain App. No. 03CA008413, 2004-Ohio-4448; State v. Williams (Mar. 10, 1997), 5th Dist. No. 1995CA00262; State v. Fields (1973), 35 Ohio App.2d 140. *Page 28 
 {¶ 63} Additionally, defendant relies upon State v. Fields (1973),35 Ohio App.2d 140, State v. Taylor, 78 Ohio St.3d 15, 1997-Ohio-243,State v. Williams (Dec. 17, 1992), Cuyahoga App. No. 61262 ("JohnnyWilliams"), and State v. Williams (Mar. 10, 1997), Stark App. No. 1995CA00262 ("Ron Williams"), in support of his contention that the inclusion of the phrase "unless satisfactorily explained" in a jury instruction on the issue of flight is unconstitutional if the defendant does not testify. Defendant's reliance upon the comment to the OJI and the above-cited cases is unavailing.
 {¶ 64} At issue in Fields was the following jury instruction:
 "Now, in this case, there is evidence tending to indicate that both of the defendants fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime. If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, and one or both have not satisfactorily explained their conduct in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants."
(Emphasis added.; id. At 144-145.)
 {¶ 65} The Fields court held that the jury instruction "unlawfully compromise[d]" the defendant's right "under the Fifth andFourteenth Amendments of the United States Constitution to remain silent and, further, not to have that silence converted into evidence against him." Id. At 145. The Fields court reasoned as follows:
 It is apparent from an examination of the above instruction that it may, and almost certainly will, be understood to require a defendant, himself, to "satisfactorily explain" his conduct in fleeing the scene of a crime, and a conscientious juror, intent upon following the law as the court gives it to him, will consequently construe the continuing silence of a defendant as a failure to so satisfactorily explain his conduct in [fleeing] *Page 29 
the scene and, therefore, is to be considered by him as a "circumstance together with all the other facts and circumstances in the case in determining the guilt or innocence" of the defendant.
 Nor does it cure the defect of this charge to point out, as the state argues, that a defendant may meet this test by a satisfactory explanation of his flight through someone other than himself, while preserving his own right to remain silent. Unfortunately, this is not the only, or even the plain meaning of the charge. The plain meaning is that the defendant shall explain the circumstance, not someone else. If there is another subtler reading of the words, we cannot depend upon or require the jury to make it.
Id. at 145-146.
 {¶ 66} Initially, we note that the instruction on flight in theFields case was slightly different than the one given in this case. InFields, the reference to whether the flight had been explained was not entirely in the passive voice, and the instruction specifically refers to the defendant as the person who must explain his actions. In this regard, the pertinent portion of the instruction in Fields provided: "If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, and one or both have notsatisfactorily explained their conduct in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants." (Emphasis added.) Here, the jury was instructed that if it found the "defendant did flee from the vicinity of the alleged crimeand this conduct has not been satisfactorily explained, you may consider the circumstances in the case in determining the guilt or innocence of the defendant." (Emphasis added.)
 {¶ 67} Additionally, the Fields decision provides no indication as to whether the trial court instructed the jury regarding defendant's right not to testify. Defendant argues that nothing indicates that the jury instruction in Fields did not also include the "standard *Page 30 
jury" instruction on the defendant's right to remain silent. (Defendant's supplemental brief, at 4.) However, unlike defendant in his appellate brief, we do not presume that such an instruction was given inFields, a case from the early 1970s. In State v. Nelson (1973),36 Ohio St.2d 79, the Supreme Court of Ohio held that it was discretionary with the trial judge whether to instruct the jury on the defendant's rights to elect not to testify. Id. at paragraph three of the syllabus. That holding was subsequently overruled in State v. Fanning (1982),1 Ohio St.3d 19, wherein the court held that a defendant has a right, if properly requested, to have the trial court instruct the jury that his failure to testify cannot be considered for any purpose. Id. at paragraph one of the syllabus. Nonetheless, it is uncertain whether such an instruction was given in Fields. Furthermore, even if the instruction was given in the Fields case, the Fields court did not analyze the instruction's possible impact on the portion of the jury instructions that it found unconstitutional.
 {¶ 68} In Taylor, supra, the Supreme Court of Ohio addressed the defendant's argument that the trial court erred in instructing the jury, over his objection, that "flight, in and of itself, does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime."Taylor, at 27. In resolving that argument, the court found that the instruction on flight was neither arbitrary nor unreasonable and did not create an improper mandatory presumption. Id. It further determined that the instruction did not "improperly comment on [the defendant's] silence, since he testified." Id., citing Fields. In the case at bar, defendant reasons that it would be a logical extension ofTaylor to conclude that the inclusion of the "unless satisfactorily explained" phrase is improper when the defendant does not testify. However, in Taylor, the defendant did testify. Thus, the Supreme Court of Ohio did not *Page 31 
analyze whether the use of the "unless satisfactorily explained" language would be improper if the defendant did not testify, even though the trial court instructs the jury that the defendant's decision not to testify cannot be considered for any purpose. Furthermore, we do not view the Taylor court's citation to the Fields case as resolving the issue found in the case at bar. Therefore, we decline to extendTaylor to resolve the issue found in this case.
 {¶ 69} The Johnny Williams court relied upon Fields in determining that the defendant was prejudiced by the jury instruction that was given on the issue of flight. However, the Johnny Williams court did not analyze the possible significance of an instruction that defendant's silence could not be used for any purpose. In addition, in theJohnny Williams case, a portion of the jury instruction on the issue of flight stated, "If, therefore, you find that the Defendant did flee from the scene of the alleged crime and has not satisfactorily explained hisconduct in the statement, you may consider this circumstance[.]" (Emphasis added.) Id.
 {¶ 70} In the Ron Williams case, the defendant argued that the trial court failed to instruct the jury to consider his testimony explaining his apparent flight. In resolving the issue, the court stated:
 Courts in Ohio have universally held that including the phrase "unless satisfactorily explained" is unconstitutional, as it wrongfully places a burden upon the defendant and violates the defendant's right to remain silent under the Fifth and Fourteenth Amendments of the United States Constitution. * * *
Id., citing Fields; State v. Harris (Apr. 10, 1986), Cuyahoga App. No. 50117; State v. Hagwood (June 2, 1995), Lake App. No. 94-L-016. On that basis, the court concluded that the trial court did not abuse its discretion by not instructing the jury on the issue of *Page 32 
flight as requested by the defendant. Id. As in the Johnny Williams
decision, the Ron Williams decision did not analyze the possible significance of an instruction that defendant's silence could not be used for any purpose.
 {¶ 71} Although the cases cited by defendant do not analyze the issue presented in this case, other cases have resolved this issue. InState v. Brady, Summit App. No. 22034, 2005-Ohio-593, the trial court instructed the jury on the issue of flight in virtually the same manner as the trial court in this case instructed the jury on that issue. SeeBrady, at ¶ 6. In Brady, the defendant argued that the instruction on flight improperly placed the burden of proof on him and that the trial court allowed his silence to be used as evidence against him in violation of his constitutional right to remain silent. See id. at ¶ 4. As in this case, the defendant relied upon Fields as support for his position. The Ninth District Court of Appeals in Brady disagreed with the defendant's contention, and it found his reliance uponFields to be unavailing because the instruction in Fields was distinguishable. See id. at ¶ 4, 8. The Brady court determined that the instruction did not direct defendant to personally explain the circumstances of his flight, and that the jury was instructed that the defendant's silence was not to be used against him. See id. at ¶ 9. TheBrady court concluded: "Under these circumstances, we do not find that Defendant's constitutional rights were violated." Id. at ¶ 9.
 {¶ 72} Furthermore, the Sixth District Court of Appeals in State v.Pitts (Sept. 30, 1997), Lucas App. No. L-96-259, resolved that the following instruction was not unconstitutional, even though the defendant did not testify:
 "In this case, there is evidence tending to indicate that the defendant fled or attempted to flee from the vicinity of the alleged crime. You are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorily *Page 33 explained, it tends to show consciousness of guilt or some guilty connection to the crime. If, therefore, you find that the defendant did flee or attempted to flee from the scene of the alleged crime and that no satisfactory explanation has been offered for his conduct, you may consider this circumstance in determining the guilt or innocence of the defendant."
(Emphasis added.)
 {¶ 73} The Pitt court reasoned that because the instruction did not direct appellant to personally explain his flight, and because the trial court instructed the jury that the defendant's silence was not to be used against him, the instruction was not unconstitutional.
 {¶ 74} We agree with the reasoning applied in Brady, as well asPitts, regarding the use of the "unless satisfactorily explained" language in jury instructions on the issue of a defendant's flight. When the jury instruction in this case is viewed in its entirety, it did not direct defendant to personally explain the apparent flight, and the jury was specifically instructed to not use defendant's silence for any purpose. Because the "unless satisfactorily explained" language is in the passive voice and no actor is specified, one is left to speculate as to who may reasonably provide the explanation, if that language is viewed in isolation. However, when the entirety of the jury instruction is considered, a conscientious juror would abide by the instruction that defendant's silence cannot be used for any purpose. It is presumed that the jury followed the court's instructions. Thus, to the extent the instruction on flight suggested that defendant was required to personally explain his apparent flight, that suggestion was abated by the court's instruction regarding defendant's right not to testify and the fact that defendant did not testify could not be used for any purpose. Therefore, the jury instructions, considered as a whole, did not require *Page 34 
defendant to personally explain his actions, nor did the instructions create an improper mandatory presumption.
 {¶ 75} Based on the foregoing, we find the Brady and Pitts decisions instructive in this case, and we conclude that the trial court did not improperly instruct the jury on the issue of defendant's flight. Consequently, we overrule defendant's third assignment of error.
 {¶ 76} Having overruled all three of defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 BRYANT and BOWMAN, JJ., concur. BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1