OPINION
{¶ 1} Defendant-appellant, Brian T. Stepp, appeals his conviction and sentence in the Butler County Court of Common Pleas on three counts of rape, three counts of kidnapping, and one count of sexual battery. We affirm.
 {¶ 2} In late 2003, C.T. was working as a prostitute in the city of Hamilton, in Butler County, Ohio. One night in November of that year, she was standing near the intersection of Lincoln Street and Dixie Highway when a man in a red car pulled up to her and offered her a *Page 2 
ride. C.T. got into the man's car, believing he was going to be a "customer."
 {¶ 3} Immediately after she did, the man started driving very fast down Lincoln Street and towards Route 4, onto which he turned north. C.T. began to get nervous after the man refused to tell her what "services" he wanted her to perform for him. When she again asked him what he wanted, the man pulled out a badge and told her she was under arrest for prostitution. He ordered her to put on her seatbelt, to lock her door, and not to think about running, because he had a gun, and he was "allowed to shoot her" and even "kill" her, and "nobody will think twice about it."
 {¶ 4} The man drove C.T. to the parking lot of a "police station" in Liberty Township and told her she could do him a "favor" or he could have her arrested. When C.T. refused to do him a favor, the man drove out of the police station's parking lot and then to a corn field, where he ordered her to get out the car and to get undressed. He then forced her to perform oral sex on him.
 {¶ 5} Afterwards, the man told C.T. stories about different scenarios he allegedly had encountered as a police officer. He then ordered her to get dressed, handcuffed her, and placed her back in his car. When he tried to frisk C.T., she tried to escape. He eventually overpowered her by kicking her and punching her in the head. He then drove out of the corn field and over to a small house.
 {¶ 6} At the house, the man led C.T. to a bathroom and ordered her to take a shower. When he left the room, C.T. tried to escape by climbing out the bathroom window; however, when the man saw what she was doing, he grabbed her hair, pulled her back inside the bathroom, slapped her, and threatened her. He then stayed until she got into the shower. After C.T. finished showering, the man made her come into the living room, where he forced her to have intercourse with him. After telling her more fictitious stories about his experiences as a police officer, he ordered C.T. to get dressed and then drove her to a *Page 3 
convenience store near Cincinnati-Dayton Road, where he dropped her off.
 {¶ 7} H.K. was another prostitute who worked in Hamilton at this time. On an early evening in late December 2003 or early January 2004, H.K. was standing in the area of North 7th Street when a man in a red car pulled up to her and offered her a ride. After H.K. got into the car, the man told her someone named "Jewel" told him she (H.K.) was a "snitch," and "a drug dealer had hired him to beat [her] up." At that point, H.K. believed that the man was threatening her life.
 {¶ 8} As the man drove H.K. into the city of Fairfield and onto Bobmeyer Road, he told her he was a police officer and showed her a badge. He also showed her a knife he had with him and told her he was going to hurt her because he had been hired to do so. The man drove to the end of a lane off Bobmeyer Road, back by a small house or church, and parked there. He then forced H.K. to perform oral sex on him.
 {¶ 9} Afterwards, H.K. got out of the car, and the man followed her. He searched her pockets and found a needle H.K. carried with her to use heroin. The man held the needle to H.K.'s neck, threatening to kill her. H.K. begged for her life. He then took her coat from her to discourage her from running away. When they got back in the car, H.K. saw the man laughing and smiling, and seemingly "enjoying himself." He then dropped H.K. off at East Avenue.
 {¶ 10} J.G. was another prostitute who worked in Hamilton at the time of these events. One afternoon in November 2003, she was standing in the area of Sycamore and Ludlow Streets when she saw a red car that "kept circling." When the car finally pulled over, J.G. got in.
 {¶ 11} Shortly thereafter, the man who was driving the car told J.G. he was a police officer. When she asked him to stop the car and let her out, the man refused to let her leave. He drove her to Tylersville Road, turned onto a dirt road, and then drove to a corn field where *Page 4 
he parked. The man went to the passenger side of the vehicle, pressed his forearm against J.G.'s neck, pulled her pants down, and raped her.
 {¶ 12} Afterwards, the man returned to the driver's side of the vehicle, and J.G. got out of the vehicle and started walking down the dirt road. The man pulled up to J.G. and ordered her to get back in the car or he would run her over. J.G. finally got back into the car because she believed the man "was capable of anything." The man drove J.G. to Grand Boulevard and told her to get out.
 {¶ 13} C.T., H.K., and J.G. did not immediately report these crimes to the police. However, on February 12, 2004, H.K. finally told the police what had happened to her on the night she was raped when she was being questioned by them on an unrelated matter. She gave the police the license plate number of the red car that was driven by the man who sexually assaulted her. The police tracked the license plate number to Brian Stepp. Detective Ken Hardin showed H.K. a photo array of suspects that contained Stepp's photograph and asked her to identify the man who raped her. It took H.K. only "a few seconds" to pick out Stepp's photograph.
 {¶ 14} Within the next five days, the police also interviewed C.T. and J.G., who told the police what Stepp had done to them in November 2003. When Detective Hardin showed C.T. and J.G. a photo array that contained Stepp's photograph, both of them picked out Stepp's photograph and indentified him as the man who had raped them.
 {¶ 15} Stepp was arrested in February 2004. In April 2004, he was indicted on three counts of rape in violation of R.C. 2907.02(A)(2), three counts of kidnapping in violation of R.C. 2905.01(A)(4), and one count of sexual battery (against C.T.) in violation of R.C. 2907.03(A)(1).[1] His trial was scheduled to start on July 12, 2004. *Page 5 
 {¶ 16} However, before Stepp could be tried on these charges, he fled the country. He was apprehended in England on September 29, 2004, and finally extradited to the United States on July 9, 2006. On his return, Stepp told the police officer who escorted him back to the United States that his lawyer had told him, "they are going to find you guilty, you need to leave."
 {¶ 17} On February 7, 2007, Stepp was tried by jury on the rape, kidnapping, and sexual battery charges. The jury convicted Stepp as charged, and the trial court sentenced him to 55 years in prison.[2]
 {¶ 18} Stepp now appeals, assigning the following as error:
 {¶ 19} Assignment of Error No. 1:
 {¶ 20} "THE PRETRIAL PHOTOGRAPHIC INDENTIFICATION PROCEDURE WAS SO UNNECESSARILY SUGGESTIVE AND CONDUCIVE TO MISIDENTIFICATION THAT MR. STEPP WAS DENIED THE DUE PROCESS OF LAW."
 {¶ 21} Stepp argues that the trial court erred in overruling his motion to suppress the out-of-court identifications by C.T., H.K., and J.G. because the photographic identification procedure used by the police was unnecessarily suggestive and conducive to misidentification. We disagree.
 {¶ 22} A witness' pretrial photographic identification of a suspect will be set aside only if the procedure is so impermissibly suggestive as to give rise to "a very substantial likelihood of irreparable misidentification." Neil v. Biggers (1972), 409 U.S. 188, 198,93 S.Ct. 375, quoting Simmons v. United States (1968), 390 U.S. 377, 384,88 S.Ct. 967. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the *Page 6 
witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers at 199.
 {¶ 23} The evidence presented at the hearing held on Stepp's motion to suppress the pretrial identifications of him shows that C.T., H.K., and J.G. had an unimpaired view of Stepp for a significant amount of time while they were inside his car and during the time he sexually assaulted them. Given the circumstances of their encounters with Stepp, it is apparent that each of the three victims paid a very close degree of attention to him at the time Stepp committed the offenses against them. Id.
 {¶ 24} The evidence also shows that two of the three victims, C.T. and H.K., picked out Stepp's photograph almost immediately from the photo array, as the man who sexually assaulted them. C.T. and H.K. had "no doubt" that Stepp was the man who raped them.
 {¶ 25} The third victim, J.G., did have some initial difficulty in picking out Stepp's photograph as the man who raped her. However, she attributed this to the fact she recognized one of the other men in the photo array, and several days later, realized this man had been one of her former high school classmates. J.G. subsequently picked out Stepp's photograph from the photo array and identified Stepp as the man who sexually assaulted her. At the hearing held on Stepp's motion to suppress the pretrial identifications, J.G. expressed certainty that Stepp was the man who sexually assaulted her in November 2003.
 {¶ 26} As to the length of time between the offense and the identifications, C.T. and J.G. testified that Stepp sexually assaulted them in November 2003, and they identified him as their attacker approximately three months later in the middle of February 2004. H.K. testified that Stepp sexually assaulted her in late December 2003 or early January 2004, and identified him as her attacker on February 12, 2004. The amount of time between the *Page 7 
offenses and the identifications was not so lengthy as to give rise to doubts about the accuracy of the identifications, particularly, in light of the amount of time the witnesses had to observe Stepp, and the nature of the offense he committed against them. Id.
 {¶ 27} Stepp also argues that the police failed to follow their procedures in conducting the photo array. However, Detective Hardin testified that he followed all of his usual procedures in conducting the photo arrays in this case, including instructing each of the witnesses that the photo array may or may not contain a photograph of the suspect. While some of the victims could not recall all of the instructions the police gave them during the photo array, the trial court was in the best position to determine whether or not Detective Hardin's testimony was truthful.
 {¶ 28} In light of the foregoing, Stepp's first assignment of error is overruled.
 {¶ 29} Assignment of Error No. 2:
 {¶ 30} "THE STATE VIOLATED MR. STEPP'S DUE PROCESS RIGHTS WHEN IT DESTROYED FAVORABLE EVIDENCE THAT WAS MATERIAL TO THE ISSUE OF GUILT."
 {¶ 31} Stepp argues that his due process rights were violated when Detective Hardin destroyed "kites" or messages that had been sent to the police by four other prostitutes while they were in jail, who told the police that they, too, had been sexually assaulted by a man in a red car. After learning that the four women were unable to identify Stepp as the man who attacked them, Detective Hardin gave them his business card and told them to contact him if anything else came up. He did not keep the "kites" or messages the women had sent to police, nor did he keep a list of their names and addresses.
 {¶ 32} Stepp contends that these four women could have exculpated him with respect to the offenses with which he was charged, and therefore, the police violated his due process rights by destroying evidence regarding the names and addresses of these four women. This *Page 8 
argument lacks merit.
 {¶ 33} The state has an obligation to disclose evidence favorable to the accused, which is material to his guilt or punishment. Brady v.Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194. "Favorable evidence is material * * * `if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley (1995), 514 U.S. 419,433-434, 115 S.Ct. 1555. "A `reasonable probability' of a different result is * * * shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.'" Id. at 434, quoting United States v. Bagley (1985), 473 U.S. 667, 678,105 S.Ct. 3375. "[T]he suppression of materially exculpatory evidence violates a defendant's due process rights, regardless of whether the state acted in good or bad faith." State v. Geeslin, 116 Ohio St.3d 252,2007-Ohio-5239, ¶ 7, citing Brady.
 {¶ 34} However, the rule in Brady does not apply to evidence that is merely "potentially useful." Geeslin at ¶ 9, 10. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at ¶ 9, quoting Arizona v. Youngblood (1988),488 U.S. 51, 58, 109 S.Ct. 333.
 {¶ 35} Stepp argues that the evidence of the names and addresses of the four other women who claimed that they had been raped by a man driving a red car constituted "material exculpatory evidence," and therefore, the good or bad faith of the police officers involved should be deemed irrelevant.
 {¶ 36} However, the four other women were not simply unable to identify Stepp as the man who sexually assaulted them; they were also unable to identify any other suspect as being the man who sexually assaulted them. Because these four women could not identify their assailant, this evidence was, at best, potentially useful rather than materially *Page 9 
exculpatory. Since there is no evidence that the police acted in bad faith in this instance, it cannot be said that a Brady violation occurred in this case. See Geeslin, 2007-Ohio-5239 at ¶ 9, 10, citingArizona v. Youngblood, 488 U.S. at 58.
 {¶ 37} Therefore, Stepp's second assignment of error is overruled.
 {¶ 38} Assignment of Error No. 3:
 {¶ 39} "TRIAL COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO RAISE EVIDENCE THAT CLEARLY FELL WITHIN THE RAPE SHIELD LAW IN PRETRIAL MOTION. THE TRIAL COURT VIOLATED STEPP'S RIGHT TO CONFRONTATION WHEN IT EXCLUDED RELEVANT IMPEACHMENT EVIDENCE."
 {¶ 40} Stepp argues that his trial counsel provided him with ineffective assistance by failing to have certain evidence admitted at trial, which, he contends, would have shown C.T. had a motive to fabricate her allegations against him.
 {¶ 41} At trial, C.T. acknowledged on cross-examination that she had tested "dirty" on multiple occasions in August and September of 2003. When Stepp's trial counsel asked C.T. why she did not receive any sanction for having violated the terms of her probation, the state objected, and the trial court sustained the objection.
 {¶ 42} At a sidebar conference, Stepp's trial counsel stated that if he were allowed to pursue this line of questioning, C.T.'s testimony would show that during the summer of 2003, she was having a sexual relationship with her probation officer in exchange for the officer's allowing her the freedom to violate the terms of her probation. Counsel contended that after this relationship was revealed, C.T. no longer had "control over the probation process, so she made up the rape allegation [against Stepp] * * * so that she could present herself as a victim and [again] receive control of the situation[.]"
 {¶ 43} The trial court refused to change its ruling sustaining the state's objection, *Page 10 
finding that the proposed line of questioning was impermissible under the rape shield law, and that Stepp's trial counsel had a duty to raise this testimony at a pretrial hearing so that C.T. would have had the opportunity to have counsel present.
 {¶ 44} Stepp now argues that the evidence the trial court excluded "was crucial to prove [C.T.]'s motive to fabricate the allegations [against him,]" and even if the "proffered" evidence falls squarely within the rape shield statute, the evidence should have been admitted, nevertheless, because exclusion of the evidence violated hisSixth Amendment right to confront C.T. He contends it is apparent from the trial court's remarks at the side bar conference that the court "would have considered this evidence had it been properly raised in a rape shield hearing[,]" and therefore, his trial counsel provided him with ineffective assistance by not doing so. We find this argument unpersuasive.
 {¶ 45} To prevail on an ineffective assistance claim, a defendant must show that (1) his trial counsel's performance was "deficient" in that it "fell below an objective standard of reasonableness"; and (2) he was prejudiced by that deficient performance in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington
(1984), 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A failure to make a sufficient showing on either the "performance" prong or the "prejudice" prong of theStrickland standard will doom a defendant's ineffective assistance claim. Id. at 697.
 {¶ 46} The line of questioning that Stepp's trial counsel sought to pursue would have produced testimony from C.T. that would have clearly violated the rape shield law contained in R.C. 2907.02. That section states in pertinent part:
 {¶ 47} "(D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity *Page 11 
shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
 {¶ 48} "* * *
 {¶ 49} "(E) Prior to taking testimony or receiving evidence of any sexual activity of the victim * * * in a proceeding under this section, the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during the trial.
 {¶ 50} "(F) Upon approval by the court, the victim may be represented by counsel in any hearing in chambers or other proceeding to resolve the admissibility of evidence. If the victim is indigent or otherwise is unable to obtain the services of counsel, the court, upon request, may appoint counsel to represent the victim without cost to the victim."
 {¶ 51} Stepp acknowledges that the exceptions listed in R.C. 2907.02(D) to the general prohibition against the admission of evidence of specific instances of the victim's past sexual activity, e.g., evidence of the origin of semen, pregnancy, or disease, etc., are inapplicable in this case. Nevertheless, he contends that his right to confront C.T., who was one of his accusers, outweighed the interests sought to be protected by the rape shield law under the circumstances of this case.
 {¶ 52} However, when the trial court refused to allow Stepp's trial counsel to pursue the line of questioning regarding C.T.'s alleged, prior relationship with her former probation officer, the court characterized this event as a "distinct separate incident," thereby indicating that the court felt this alleged, past incident had little or no probative value.
 {¶ 53} Furthermore, the point that Stepp's trial counsel was trying to make, i.e., C.T. fabricated the allegation against Stepp to regain "control" of the situation regarding her *Page 12 
probation after her affair with her former probation officer was revealed, was a tenuous one, at best, and therefore, it is unlikely the trial court would have found, under these circumstances, that Stepp's confrontation rights outweighed the interests sought to be protected by this state's rape shield law.
 {¶ 54} Moreover, it cannot be shown that there was a reasonable probability that the outcome of Stepp's trial would have been different had this evidence been admitted. The evidence of Stepp's guilt was formidable and, arguably, overwhelming. C.T.'s testimony was corroborated by the other victims in the case, as well as the evidence the police found as a result of searching Stepp's residence, which included a red vehicle and a silver badge that matched C.T.'s version of events. Also, the detectives who searched Stepp's residence testified that the layout of Stepp's house matched C.T.'s description of the house. C.T.'s testimony was also corroborated by that of H.K. and J.G., who testified that Stepp attacked them in a similar fashion and around the same time period.
 {¶ 55} When the state's evidence against Stepp is viewed in its entirety, it is clear that the trial court's exclusion of evidence regarding C.T.'s alleged affair with her former probation officer did not change the outcome of Stepp's trial, nor does it undermine our confidence in the outcome of these proceedings. Strickland,466 U.S. at 694.
 {¶ 56} Therefore, Stepp's third assignment of error is overruled.
 {¶ 57} Assignment of Error No. 4:
 {¶ 58} "THE TRIAL COURT VIOLATED BRIAN STEPP'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION FOR RAPE, KIDNAPPING, AND SEXUAL BATTERY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 59} Stepp argues that the testimony of C.T. was "completely unreliable" because "she consistently lied about the facts surrounding the incident," "had a history of attempting to *Page 13 
manipulate the judicial system," and "[t]here was no evidence to corroborate [her] account." Therefore, he argues, the jury's verdict finding him guilty of the offenses in which C.T. was the alleged victim was contrary to the manifest weight of the evidence. We disagree.
 {¶ 60} Contrary to what Stepp alleges, C.T.'s testimony was not uncorroborated. As we have already indicated in our response to Stepp's third assignment of error, C.T.'s testimony was corroborated by the evidence the police found when they searched Stepp's residence, and by H.K.'s and J.G.'s testimony, which indicated that Stepp attacked them in a similar manner and around the same time period. When the state's evidence against Stepp is viewed in its entirety, it is clear that the jury did not lose its way in convicting Stepp of the counts in which C.T. was the victim. See State v. Thomkins, 78 Ohio St.3d 380, 387,1997-Ohio-52.
 {¶ 61} Accordingly, Stepp's fourth assignment of error is overruled.
 {¶ 62} Assignment of Error No. 5 states:
 {¶ 63} "MR. STEPP'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE TRIAL COURT INSTRUCTED THE JURY ON FLIGHT IN VIOLATION OF MR. STEPP'S RIGHTS."
 {¶ 64} Stepp argues that the trial court erred when it instructed the jury that "Voluntary flight, unless satisfactorily explained, may tend to show a consciousness of guilt," because the instruction "impermissibly and unconstitutionally" shifted the burden on him to "satisfactorily explain" why he fled in 2004, even though he had exercised his constitutional right to remain silent at his trial. He acknowledges his trial counsel failed to object to the instruction, but contends that the trial court committed plain error by issuing the instruction, and his trial counsel provided him with ineffective assistance by not objecting to it. These arguments lack merit.
 {¶ 65} In State v. Fields (1973), 35 Ohio App.2d 140, the trial court issued the *Page 14 
following instruction to the jury on the defendants' flight from the crime scene:
 {¶ 66} "`Now, in this case, there is evidence tending to indicate that both of the defendants fled from the vicinity of the alleged crime. In this connection, you are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorilyexplained, it tends to show consciousness of guilt or a guilty connection with the crime. If, therefore, you find that one or both of the defendants did flee from the scene of the alleged crime, and one orboth have not satisfactorily explained their conduct in so doing, you may consider this circumstance together with all other facts and circumstances in the case in determining the guilt or innocence of one or both of the defendants.' (Emphasis ours.)" Id. at 144-145.
 {¶ 67} The Fields court found that this instruction "unlawfully compromised" a defendant's rights "under the Fifth andFourteenth Amendments of the United States Constitution to remain silent and, further, not to have that silence converted into evidence against him." Id. at 145. Specifically, the court stated:
 {¶ 68} "It is apparent from an examination of the above instruction that it may, and almost certainly will, be understood to require a defendant, himself, to `satisfactorily explain' his conduct in fleeing the scene of a crime, and a conscientious juror, intent upon following the law as the court gives it to him, will consequently construe the continuing silence of a defendant as a failure to so satisfactorily explain his conduct in fleeing the scene and, therefore, is to be considered by him as a `circumstance together with all the other facts and circumstances in the case in determining the guilt or innocence' of the defendant." Id.
 {¶ 69} The Fields court rejected the state's argument that the defendant could meet his burden of "satisfactorily explaining" his flight through the testimony of someone other than himself, while preserving his own right to remain silent, because "[t]he plain meaning [of the instruction] is that the defendant shall explain the circumstance, not someone else." *Page 15 
(Emphasis sic.) Id. at 145-146. The court added, "If there is another subtler reading of the words, we cannot depend upon or require the jury to make it." Id. at 146.
 {¶ 70} Stepp cites Fields in support of his claim that the trial court's jury instruction on flight constituted error. However, the instruction given by the trial court in this case is readily distinguishable from the one found to constitute error inFields.
 {¶ 71} In this case, the trial court issued the following instruction to the jury regarding the evidence presented on Stepp's flight:
 {¶ 72} "The State has presented evidence that the Defendant fled from the United States after he was charged with the offense in this case. That evidence, by itself, is by no means strong enough to support a conviction, but you may consider it along with the other evidence in determining the guilt or innocence of the Defendant. Voluntary flight, unless satisfactorily explained, may tend to show a consciousness of guilt. In considering evidence of flight, you will consider the Defendant's motive to flee. In that regard, you will consider all of the facts and circumstances in evidence. If the Defendant's flight was prompted by a consciousness of guilt of the charges set forth in the indictment, you may consider that circumstance along with the other evidence. If, however, if you find that some other motive prompted the flight, you will not consider flight in determining guilt or innocence."
 {¶ 73} The trial court also instructed the jury not use the defendant's silence for any purpose.
 {¶ 74} Several courts in this state have distinguished Fields where the instruction (1) does not direct the defendant to personally explain the circumstances of his flight, and (2) the trial court instructs the jury that the defendant's silence was not to be used against him. SeeState v. Morris, Franklin App. No. 05AP-1032, 2007-Ohio-2382, ¶ 62-70;State v. Brady, Summit App. No. 22034, 2005-Ohio-593, ¶ 71; andState v. Pitts (Sept. 30, 1997), Lucas App. No. L-96-259. *Page 16 
 {¶ 75} In this case, the trial court's instruction on flight did not direct Stepp to personally explain why he fled. The trial court instructed the jury that Stepp had a constitutional right not to testify, and that "he must not be prejudiced in any way for exercising that constitutional right." Therefore, we conclude that the trial court's jury instruction on flight did not compromise Stepp's right to remain silent and to not have that silence used against him. SeeMorris; State v. Brady; and Pitts; cf. Fields,35 Ohio App.2d at 144-145.
 {¶ 76} Consequently, Stepp's fifth assignment of error is overruled.
 {¶ 77} Assignment of Error No. 6:
 {¶ 78} "MR. STEPP'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE TRIAL COURT REFUSED TO ALLOW HIM TO READ, REBUT AND/OR EXPLAIN EVIDENCE FROM VICTIM IMPACT STATEMENTS AND THEN RELIED ON THEM WHEN DETERMINING HIS SENTENCE."
 {¶ 79} Stepp argues that the trial court erred in refusing to allow him to view any victim impact statement filed with the court so that he could rebut any materially false information contained therein.
 {¶ 80} However, during Stepp's disposition hearing, the trial court stated that it found nothing in the victim impact statement that it did not already know from the victim's trial testimony. The trial court stated it would rely on that testimony and any statement made at Stepp's sentencing hearing. Consequently, Stepp was not prejudiced by the trial court's refusal to let him view the victim impact statements filed in this case.
 {¶ 81} Therefore, Stepp's sixth assignment of error is overruled.
 {¶ 82} Assignment of Error No. 7:
 {¶ 83} "TRIAL COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO THE TRIAL COURT'S IMPOSITION OF MAXIMUM AND CONSECUTIVE SENTENCES." *Page 17 
 {¶ 84} Stepp argues that his trial counsel provided him with ineffective assistance by failing to object to the trial court's imposition of maximum and consecutive sentences. In support, he contends that since the offenses on which he was convicted occurred in 2004, he was entitled "to presumptive concurrent and nonmaximum sentences," and therefore, his sentence violates "the Ex Post Facto and Due Process Clauses, as well as the Sixth Amendment as articulated in Blakely v.Washington (2004), 542 U.S. 296." This argument lacks merit.
 {¶ 85} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the Ohio Supreme Court held that R.C. 2929.14(B) and (C) and 2929.19(B)(2), which required judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or a defendant's admission, and R.C. 2929.14(E)(4) and 2929.41(A), which required judicial fact-finding before imposition of consecutive sentences, were unconstitutional under Blakely and Apprendi v. New Jersey (2000),530 U.S. 466, 120 S.Ct. 2348.
 {¶ 86} As a result, the Foster court "severed" these provisions from Ohio's sentencing scheme, see Foster at paragraphs two and four of the syllabus, and held that trial courts "have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.
 {¶ 87} To date, every appellate district in this state, including this one, has found that the retroactive application of Foster does not violate the Ex Post Facto Clause of the United States Constitution or an offender's due process rights. See State v. Keeton, Richland App. No. 2007-CA-13, 2007-Ohio-6432, ¶ 17, citing, among others, State v.Andrews, Butler App. No. CA2006-06-142, 2007-Ohio-223. See, also,State v. Conn, Clermont App. No. CA2006-10-083, 2007-Ohio-2994, ¶ 12.
 {¶ 88} Consequently, the sentence imposed on Stepp did not violate his rights under *Page 18 
the Ex Post Facto Clause of the United States Constitution, his due process rights, or his Sixth Amendment rights under Blakely, and therefore, Stepp's trial counsel was not ineffective for failing to argue otherwise.
 {¶ 89} Accordingly, Stepp's seventh assignment of error is overruled.
 {¶ 90} Assignment of Error No. 8:
 {¶ 91} "THE TRIAL COURT ERRED IN SENTENCING MR. STEPP TO SERVE CONSECUTIVE PRISON TERMS."
 {¶ 92} Stepp argues that as a result of State v. Foster, there is no longer any provision in the Ohio Revised Code that authorizes a trial court to impose consecutive sentences on an offender, because prior toFoster, a trial court's authority to impose consecutive sentences derived from R.C. 2929.14(E), but since Foster severed that provision from Ohio's felony sentencing scheme, trial courts no longer have authority to impose consecutive sentences. We find this argument unpersuasive.
 {¶ 93} Foster found that R.C. 2929.14(E)(4), which required a sentencing court to make judicial findings of fact not proven to a jury beyond a reasonable doubt before imposing consecutive terms on an offender, was unconstitutional under Apprendi v. New Jersey (2000),530 U.S. 466, 120 S.Ct. 2348, and Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531. See Foster at paragraph three of the syllabus.
 {¶ 94} However, the Foster court also found that R.C. 2929.14(E)(4) was capable of being severed from Ohio's sentencing scheme, and that "[a]fter the severance, judicial fact-finding is not required before imposition of consecutive prison terms." Foster at paragraph four of the syllabus. Thus, the Foster court clearly indicated that a trial court may, in its discretion, impose consecutive sentences on an offender.
 {¶ 95} While Foster did not expressly discuss the source of a trial court's authority to *Page 19 
impose consecutive sentences on an offender, the Ohio Supreme Court has long recognized that a trial court has "inherent power, derived from the common law," to do so. See State v. Worrell, Franklin App. No. 06AP-706,2007-Ohio-2216, ¶ 11, citing Henderson v. James (1895), 52 Ohio St. 242,254-255; State ex rel. Stratton v. Maxwell (1963), 175 Ohio St. 65, 67; and Stewart v. Maxwell (1963), 174 Ohio St. 180, 181.
 {¶ 96} Therefore, Stepp's eighth assignment of error is overruled.
 {¶ 97} Judgment affirmed.
WALSH, P.J. and YOUNG, J., concur.
[1] Stepp was also charged with three counts of impersonating a peace officer in violation of R.C. 2921.51(D), but the state later dismissed these counts.
[2] Specifically, the trial court ordered Stepp to serve ten years on each of the three rape charges, five years on the sexual battery charge involving C.T., ten years on the kidnapping charge involving C.T., seven years on the kidnapping charge involving H.K., and three years on the kidnapping charge involving J.G. The trial court also ordered Stepp to serve each of the sentences consecutively, for a total prison term of 55 years. *Page 1