OPINION
{¶ 1} Charles Washington, defendant-appellant, appeals from the judgment of the Franklin County Court of Common Pleas in which the court found him guilty, pursuant to a jury trial, of one count of aggravated murder without specification, which is a violation of R.C. 2903.01; and one count of aggravated robbery, in violation of R.C. 2911.01, which is a first-degree felony. *Page 2 
 {¶ 2} On the evening of November 2, 2004, Robert L. Pinson, a paraplegic, had several people at his apartment for a party, including appellant and a prostitute; Ozzie Pinson, who lived in the apartment and is Robert's brother; TeShawn Whitson, who is appellant's son; and others. Ozzie went to bed around midnight while the others drank alcohol and/or smoked crack. Although appellant and the prostitute were still there the next morning, by the time Ozzie left for work, only Robert and his new home nurse, Earline Munobe, were at the apartment.
 {¶ 3} Appellant returned to Robert's apartment, but Robert told him he could not talk to him while his nurse was there. Robert then went to the bank, and, while he was gone, appellant came to his apartment and told Earline that he wanted to talk to Robert. Robert returned, and around noon or 1:00 p.m., he left to cash his check. Appellant again returned to the apartment, and Earline saw him peering in through a window. Todd Richardson, a neighbor, testified that Robert watched him and appellant shoot dice from the doorway that afternoon. Robert asked Todd to wheel him to cash his check, but Todd declined. Appellant then offered to take Robert to the store, but Robert declined. Earline left Robert's apartment in the late afternoon.
 {¶ 4} Robert and Earline talked over the phone between 4:00 and 5:00 p.m., and Earline heard male voices in the background. Ozzie returned to his and Robert's apartment around 5:00 p.m., but no one answered the door. Robert's bedroom window was open, but the apartment was locked, and Ozzie did not have a key. Around 4:30 to 5:30 p.m., Todd knocked on Robert's door, but appellant answered. Appellant cracked the door open and stated Robert was not home. Appellant was wearing gloves at the time. *Page 3 
 {¶ 5} Robert's body was found that evening in his apartment by TeShawn, and officers arrived at approximately 7:00 p.m. Robert's jugular vein had been cut, and he had bled to death. Toxicology tests showed cocaine and alcohol in his blood. Tests also revealed blood on appellant's pant leg that matched Robert's DNA.
 {¶ 6} Appellant was charged with aggravated murder with specifications and aggravated robbery. After a jury trial, appellant was found guilty of one count of aggravated murder without specification and one count of aggravated robbery. A sentencing hearing was held, and appellant was sentenced to the mandatory sentence of 20 years to life on the aggravated murder conviction and the maximum sentence of 10 years on the aggravated robbery conviction, with the sentences to be served consecutively. Appellant appeals the judgment of the trial court, asserting the following assignments of error:
 [I.] The jury verdicts were against the manifest weight of the evidence[.]
 [II.] The jury verdicts were not supported by legally sufficient evidence.
 [III.] The trial court erred in imposing a maximum, consecutive sentence for aggravated robbery.
 [IV.] Charles Washington was not provided effective assistance of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution[.]
 [V.] The trial court erred in failing to block all the testimony regarding DNA evidence after the State of Ohio confused the blood samples of the deceased Robert L. Pinson and a third party and conducted more DNA testing after the trial had started[.] *Page 4 
 {¶ 7} We will address appellant's first and second assignments of error together. Appellant argues in his first assignment of error that the jury's verdict was against the manifest weight of the evidence. Appellant argues in his second assignment of error that the jury's verdict was not supported by sufficient evidence. When reviewing the sufficiency of the evidence, an appellate court examines the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781.
 {¶ 8} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a conviction so long as the State of Ohio, plaintiff-appellee ("state"), presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v. Getsy (1998),84 Ohio St.3d 180, 193-194; State v. Eley (1978), 56 Ohio St.2d 169, syllabus. In *Page 5 
conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 9} Here, appellant contends that the evidence was insufficient as to his convictions for aggravated murder and aggravated robbery. With regard to aggravated murder, R.C. 2903.01(A), provides:
 No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 10} Here, there was sufficient evidence, if believed, to establish all of the elements of aggravated murder beyond a reasonable doubt. There was evidence that appellant possessed a knife on the day of the murder and often carried knives. Collie Trant, a forensic pathologist and former deputy coroner in Franklin County, testified Robert was stabbed with a double-edged knife. Geraldine Heller, Robert's niece, testified that, on the morning of November 3, 2004, while at Robert's apartment, she observed appellant "clicking" a knife open and closed, and she said he "always" had a pocketknife on him. When she asked him what he was doing, he stated "head hunting."
 {¶ 11} The evidence also established that Robert owed appellant money. Appellant admitted in both his interview with police and in his trial testimony that Robert owed him $ 20 for a loan he gave to Robert on November 2, 2004. Appellant also admitted he knew Robert was getting his government check that day, and he wanted his $ 20 loan repaid. Todd testified appellant was persistent in telling Robert he could push him to the bank, though Robert declined. Earline, Robert's home nurse, testified that *Page 6 
Robert went to the bank in the early afternoon and had cash in his shirt pocket. However, Dana Croom, a detective with the Columbus Police Department, testified that no money was found on Robert, and there was no cash found around Robert's body. Thus, this evidence established a motive for the murder, i.e., money. Further, although the two were apparently friends, the debt may have strained their relationship. A strained relationship among friends is one factor to consider in determining prior calculation and design. See State v. Jenkins (1976),48 Ohio App.2d 99, 102.
 {¶ 12} There was also testimony that indicated appellant had been acting oddly toward Robert the day of the murder and was persistent in his need to see Robert. Earline testified that, when she was at Robert's apartment the morning of November 3, 2004, appellant came to the apartment twice insisting to talk to Robert, but Robert told him he could not talk while his nurse was at the home. When Earline went to the dumpster to dispose of trash later that morning, appellant was still lingering outside the apartment building. When Robert left for the bank at about noon or 1:00 p.m., Earline saw appellant staring at her through a window, which scared her. After Robert returned from the bank, appellant again came to the apartment seeking to talk to him, but Robert told him he still could not talk. Based upon this evidence, the jury could have believed that appellant was attempting to collect payment for the loan, and that Robert's consistent rebuffing of appellant was angering appellant. Also, the jury could have interpreted the above evidence as demonstrating that appellant had been contemplating what actions he was going to have to take to recover his money throughout the day, providing evidence of prior calculation and design. *Page 7 
 {¶ 13} Also demonstrative of prior calculation and design is the type of wound from which Robert died. Robert's neck sustained a single slash caused by a knife. There were no other knife wounds on Robert's body. The jury could have found doubtful that such a precisely placed wound would be inflicted on the spur of the moment. See State v. Tibbetts
(2001), 92 Ohio St.3d 146, 162 (stab wounds so closely grouped near the victim's heart showed a deliberate effort to kill in the most efficient manner possible). See, also, State v. Hanna, 95 Ohio St.3d 285,2002-Ohio-2221, at ¶ 39 (purpose and prior calculation must be reached by a definite process of reasoning in advance of the murder, which process includes a mental plan involving studied consideration of the method and means of causing death); Jenkins, supra, at 102 (prior calculation and design includes an analysis of the means by which to kill). The jury could have also believed that such a wound would typically be inflicted by one who would approach the subject from behind. There was testimony that Robert was very strong as a result of his having to operate his wheelchair; thus, the perpetrator would have also likely approached from behind for this reason. Also indicative that Robert was killed from behind is the lack of any defense wounds on his hands or arms. A deliberate, furtive approach from behind would further tend to establish that the perpetrator acted with prior calculation. SeeJenkins, supra, at 102 (whether the act was drawn out or an almost instantaneous eruption of events is a factor in determining the existence of prior calculation and design). That Todd saw appellant wearing gloves when appellant opened Robert's apartment door also would support a finding that appellant engaged in enough forethought to conceal his responsibility for the crime. *Page 8 
 {¶ 14} Further, there was testimony that placed appellant at Robert's apartment around the time of the murder. Earline left at about 4:00 p.m., and Robert called her before 5:00 p.m. to tell her that she had left her glasses at the apartment. Further, between 4:30 and 5:30 p.m., appellant answered the door to Robert's apartment. He only cracked it open, and he was wearing utility gloves. Todd stated he felt Robert was being held inside his apartment against his will but that, at most, appellant would take a few dollars from him. Earline also stated that sometime before 5:00 p.m., when she spoke to Robert on the phone, she heard male voices and music in the background. Thus, if the jury was to believe Todd's and Earline's testimony, Robert was murdered sometime between 4:30 and 7:00 p.m., and appellant was the last person seen at the scene of the crime, wearing gloves and acting suspiciously.
 {¶ 15} Perhaps the most damning evidence against appellant was that Robert's blood was found on the jeans appellant was wearing when he was picked up by police several days after the murder. Amoreena Clarkson, who works for the Columbus Police Department's DNA section, testified that the stain on appellant's pant leg matched Robert's DNA. William Gillette, a detective with the Columbus Police Department, stated the clothing appellant was wearing when he was picked up fit the description of the clothing he was wearing the day Robert died. Appellant admitted the clothes he was wearing on the day of Robert's murder were the same clothes he was wearing when he was apprehended by police. Thus, the jury could have believed that the presence of Robert's blood on appellant's pants supported a finding that appellant murdered Robert. Given all the foregoing evidence, we find there was sufficient evidence that, if believed, would establish that appellant murdered Robert with prior calculation and design. *Page 9 
 {¶ 16} We also find that appellant's conviction for aggravated murder was not against the manifest weight of the evidence. To counter the above evidence, appellant presents several arguments, none of which are convincing. At trial, appellant argued that the blood on his pants resulted from Robert's common tendency to cut his fingers while fashioning crack pipes out of soda cans or glass stems. However, the jury could have easily dismissed this theory. Appellant admitted in his testimony that he never saw Robert cut his hand the night of the murder and saw no cuts on his fingers. Mark Green, a detective in the Columbus Police Department's Crime Scene Search Unit, testified he saw no new or old cuts on Robert's fingers. Further, at trial, when questioned how the blood could have gotten on his pants, appellant could offer no explanation. Thus, the jury could have reasonably rejected appellant's contention, in this respect.
 {¶ 17} Appellant also claims that the blood on his jeans was a relatively small amount, yet Robert bled profusely. Trant, the forensic pathologist, did testify that there was a significant amount of blood at the scene, and it would be unlikely that the murderer would not also have a lot of blood on his clothes. However, if the jury believed that appellant slit Robert's neck from behind, it could have also reasonably believed that appellant would not necessarily have had a lot of blood on his clothes. The single knife wound, though lethal, was relatively small, and TeShawn testified only that there was a large puddle of blood on the floor under Robert's head, and he did not mention blood anywhere else in the apartment. There was also no testimony indicating significant blood splatter at the scene, thereby diminishing the prospect that the assailant would have been splattered with blood. *Page 10 
 {¶ 18} Appellant also attacks the credibility of many of the state's witnesses. All of the witnesses who gave testimony as to the factual circumstances surrounding the murder were admitted habitual crack users, except for TeShawn, who admittedly smoked marijuana but sold crack. All of these witnesses also admitted to using crack on and/or around the day of the murder. However, apparently the jury chose to believe these witnesses, and we have no reason to second-guess that determination. The jury was in the best position to personally view each witness and adjudge his or her credibility.
 {¶ 19} In addition, appellant lacked a verifiable alibi for his whereabouts after Todd saw him at Robert's apartment on the evening of the murder. Appellant testified that he went "out east" after he left the apartment, but he admitted there was no one who could testify as to who gave him a ride out east. He also claimed to have not slept anywhere the night of the murder. The jury could have found appellant's failure to explain his whereabouts immediately after the murder was indicative of his fleeing the scene or disposing of evidence.
 {¶ 20} Therefore, viewing all the reasonable inferences that arise from the evidence, and having no reason to disturb the weight given to this evidence by the jury, we cannot find the jury clearly lost its way and created a manifest miscarriage of justice. The version of the facts given by the state's witnesses did not conflict in any meaningful way, and would not conflict with appellant's opportunity to commit the murder. Thus, the jury's verdict finding appellant guilty of aggravated murder was not against the manifest weight of the evidence. *Page 11 
 {¶ 21} With regard to aggravated robbery, R.C. 2911.01 provides, in pertinent part:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 * * *
 (3) Inflict, or attempt to inflict, serious physical harm on another.
 {¶ 22} After a review of the evidence, we find there was sufficient evidence to prove the essential elements of aggravated robbery. Appellant admitted that Robert owed him $ 20 on the day of the murder. Appellant also knew Robert was getting his check that day, and he testified he wanted the $ 20 loan repaid. Earline testified that appellant came to the apartment at least four times to speak with Robert the day of the murder, and he was persistent in his pursuit to speak with him. Earline also saw Robert return from a trip to the bank, from which he withdrew $ 365, and he had cash in his shirt pocket, but Detective Croom testified that no money was found on or near Robert's body.
 {¶ 23} Further, as the state points out, the photographs admitted at trial show Robert's pockets pulled inside out and some contents on the floor, suggesting that someone went through Robert's pockets looking for valuables. Robert's watch was also partially removed. The police and first responders who testified denied having touched the body. Again, appellant was the only known person to see Robert in the hours before he was murdered. Todd saw him at Robert's apartment within the period in which Robert must have been robbed and killed. For these reasons, we find there was sufficient *Page 12 
evidence that, if believed by the jury, would establish the elements of aggravated robbery beyond a reasonable doubt.
 {¶ 24} With regard to the manifest weight of the evidence, although appellant suggests that TeShawn could have taken Robert's money when he crawled through the window and discovered the body, or Todd could have taken the money when he crawled through the window to let the paramedics into the apartment, there is no evidence to support such theories. In addition, although appellant testified that Robert had repaid him the money around 12:30 or 1:30 p.m. on November 3, 2004, he also claimed Earline was not there at the time, which contradicted Earline's testimony that she was at the apartment the entire afternoon. The jury apparently believed Earline's testimony. After a review of the record, we find the jury's verdict was not against the manifest weight of the evidence. Therefore, for the above reasons, appellant's first and second assignments of error are overruled.
 {¶ 25} Appellant argues in his third assignment of error that the trial court erred in imposing a maximum, consecutive sentence for aggravated robbery, based upon Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, and the Ohio Supreme Court's decision in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856. Subsequent to appellant's sentencing, the Ohio Supreme Court issued Foster, in which it held that Ohio's former sentencing scheme unconstitutionally required judicial fact-finding before a trial court could impose non-minimum, maximum, and consecutive sentences, in violation of the Sixth Amendment to the United States Constitution and the rule of law articulated in Blakely. As a result, the court in Foster severed those statutes from Ohio's sentencing *Page 13 
scheme and thereby granted trial courts the discretion to impose non-minimum, maximum, and consecutive sentences without judicial fact-finding. Foster, at ¶ 99-100.
 {¶ 26} Here, the trial court made the formerly required statutory factual findings to impose maximum and consecutive sentences. Given the holding in Foster, the trial court erred. However, in State v.Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, this court concluded that "a defendant who did not assert a Blakely challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on Foster." Id., at ¶ 7. In other words, "aBlakely challenge is waived by a defendant sentenced afterBlakely if it was not raised in the trial court." Id., at ¶ 8. In the case at bar, appellant's sentencing hearing occurred after the decision in Blakely, but appellant's counsel did not raise error in the trial court on the basis of Blakely. Therefore, appellant has waived all but plain error as to this issue. See, e.g., State v. Hairston, Franklin App. No. 06AP-420, 2007-Ohio-143; State v. Ragland, Franklin App. No. 04AP-829, 2007-Ohio-836. Although appellant has not alleged plain error, we note that this court has declined to apply the plain error doctrine under these circumstances, as a trial court is no longer required to engage in judicial findings prior to the imposition of consecutive and maximum sentences. See, e.g., State v. Morris, Franklin App. No. 05AP-1032, 2007-Ohio-2382, at ¶ 58, citing State v. Jones, Franklin App. No. 06AP-734, 2007-Ohio-1466. For these reasons, appellant's third assignment of error is overruled.
 {¶ 27} Appellant argues in his fourth assignment of error that he was not provided effective assistant of counsel as guaranteed by theSixth Amendment to the United States Constitution. The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the *Page 14 
trial attorney was not functioning as the "counsel" guaranteed appellant under the Sixth Amendment, and (2) that the deficient performance prejudiced appellant's defense. Strickland v.Washington (1984), 466 U.S. 668, 686-687, 104 S.Ct. 2052. Essentially, appellant must show that the proceedings, due to his attorney's ineffectiveness, were so unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. Id., at 693. Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Id., at 689. In Ohio, a properly licensed attorney is presumed to execute his or her duties in an ethical and competent manner. State v. Hamblin (1988),37 Ohio St.3d 153, 155-156. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel.State v. Phillips (1995), 74 Ohio St.3d 72, 85. Reviewing courts must not use hindsight to second-guess trial strategy, and must bear in mind that different trial counsel will often defend the same case in different manners. Strickland, at 689; State v. Keenan (1998),81 Ohio St.3d 133, 152.
 {¶ 28} Appellant asserts several ways in which his trial counsel was ineffective: (1) trial counsel refused to call any of the witnesses appellant wished to call; (2) trial counsel refused to present all the evidence the defense possessed, specifically an expert opinion that the DNA was placed on appellant's jeans after the jeans left appellant's presence; and (3) trial counsel permitted the jury to hear negative information about appellant that was unrelated to appellant's guilt or innocence. With regard to the first two claims, there is nothing in the record before this court upon which we can find ineffective assistance of counsel. Appellant raised these two non-specific complaints at his sentencing hearing but *Page 15 
failed to present any specific details. Appellant failed to explain what other witnesses existed and their potential testimony, and failed to identify the expert witness or how the expert would be capable of determining precisely when Robert's blood was deposited on appellant's pants. Because a determination of these two claims of ineffective assistance of counsel involve facts outside the record, appellant's argument concerning trial counsel's failure to call other alleged witnesses and an expert witness must fail. See State v. Cooperrider
(1983), 4 Ohio St.3d 226 (post-conviction relief, not a claim on direct appeal, is the proper procedure for raising a claim of ineffectiveness of trial counsel when the evidence to support such is outside the record).
 {¶ 29} With regard to the third claim, that trial counsel permitted the jury to hear negative information about appellant unrelated to his guilt or innocence, we find this argument not well-taken. The information about which appellant complains is related to appellant's use of crack, his sexual relations with a prostitute the evening before and the morning of the murder, his recently completed prison sentence, his failure to marry TeShawn's mother, his failure to support his children, his employment situation, and his family problems. However, after a review of the record, we find that the admission of all of this testimony was proper.
 {¶ 30} The law is well-settled that evidence of prior bad acts cannot be used to prove character in order to show conduct in conformity therewith. However, evidence is permissible for other purposes, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). Further, the admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Jacks (1989), 63 Ohio App.3d. 200, 207. Here, evidence of appellant's lack of *Page 16 
employment and his recent release from prison were probative of his motive to commit the murder for monetary gain and were not unduly prejudicial. Further, the evidence of appellant's use of crack and his relations with a prostitute the evening before and day of the murder provided the jury with crucial background information in considering the rest of the evidence. See State v. Skatzes, 104 Ohio St.3d 195,2004-Ohio-6391, at ¶ 113. It would have been virtually impossible to put the factual circumstances into context without explaining to the jury exactly what appellant was doing at Robert's apartment and whom he was with during these critical times. Similarly, appellant's failure to marry TeShawn's mother, his family problems, and his failure to support his children put the underlying interpersonal relationship between TeShawn, a witness for the state, and appellant into context. From appellant's perspective, such evidence might have even been beneficial, as the jury may have viewed this evidence as reasons TeShawn or others in the neighborhood might be biased against appellant. Therefore, we find that appellant's trial counsel did not provide ineffective assistance by permitting the jury to hear this information. For the foregoing reasons, appellant's ineffective assistance of counsel claims must fail, and appellant's fourth assignment of error is overruled.
 {¶ 31} Appellant argues in his fifth assignment of error that the trial court erred when it failed to block all the testimony regarding DNA evidence after the state confused the blood samples of the deceased and a third party and conducted more DNA testing after the trial had started. During the questioning of Collie Trant, it became apparent that the coroner had drug tested "antemortem blood," which is drawn at a hospital. Trant admitted that Robert's body never went to a hospital but came straight to the morgue. Thereafter, it was determined that, due to a labeling mistake, blood from an unrelated *Page 17 
third party that was delivered by a hospital to the coroner around the same time Robert's blood was received by the coroner was misidentified by the coroner as being antemortem blood from Robert. After Trant's testimony, without advising defense counsel that it was doing so, the state retested Robert's blood drawn by the coroner. This subsequent test confirmed that Robert's blood, and not the blood of the unrelated third party, matched the DNA found on appellant's pants. Appellant claims herein that the DNA results of the subsequent, mid-trial test should not have been admitted into court because the coroner's office had "close links physically and emotionally" and was under "enormous pressure" upon retesting to minimize the effect of their mistake. Appellant maintains that the "whole handling" of the blood was so "out of focus" that the reliability of the testimony and procedures was not clear. We disagree.
 {¶ 32} As indicated above, the admission or exclusion of evidence rests within the sound discretion of the trial court. SeeJacks, supra, at 207. Initially, we fail to find any prejudicial impact upon appellant due to the retesting of Robert's blood. Robert died as a result of a stab wound to his neck, and the first erroneous toxicology results were unrelated to the cause of death or any other issue significant to appellant's guilt or innocence. Further, the erroneous testing affected only the toxicology results and not the DNA results. There is no evidence that the blood of the unrelated third party was ever used in the DNA testing. The only reason DNA retesting was completed on Robert's blood was to eliminate any uncertainty or any claim that the first DNA results were unreliable because of the botched toxicology test. In addition, the retesting of Robert's blood only confirmed the coroner's initial DNA testing of Robert's blood and was not a "new" test on a different blood sample. For these reasons, we fail to find appellant was *Page 18 
prejudiced by the state's retesting of Robert's blood, and the trial court did not err in admitting evidence and testimony regarding the DNA retesting. Therefore, appellant's fifth assignment of error is overruled.
 {¶ 33} Accordingly, appellant's first, second, third, fourth, and fifth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 BRYANT and PETREE, JJ., concur. *Page 1