[Cite as *State v. Foster*, 2025-Ohio-1382.]

IN THE COURT OF APPEALS OF OHIO

TENENTH APPELLATE DISTRICT

State of Ohio,                                          :

      Plaintiff-Appellee,                     :                    No. 24AP-341
                                            (C.P.C. No. 22CR-4685)

v.                                                              :

                                             (REGULAR CALENDAR)

Chrystian S. Foster,                                :

      Defendant-Appellant.                  :

---

## D E C I S I O N

Rendered on April 17, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

**On brief:** *The Behal Law Group LLC*, and *John M. Gonzales*, for appellant. **Argued:** *John M. Gonzales*.

---

APPEAL from the Franklin County Court of Common Pleas

JAMISON, P.J.

{¶ 1} Defendant-appellant, Chrystian S. Foster, appeals from a conviction by bench trial in the Franklin County Court of Common Pleas. For the following reasons, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On October 7, 2022, a Franklin County Grand Jury indicted Foster on the following charges: Count 1, murder, a violation of R.C. 2903.02, an unclassified felony (purposely caused the death of G.C.); and Count 2, murder, a violation of R.C. 2903.02, an unclassified felony (caused the death of G.C. as a proximate cause of committing felonious assault). Foster waived his right to a jury trial and elected to be tried by a judge of the trial court. Prior to the commencement of the bench trial, the state dismissed Count 1 and elected to proceed solely on Count 2. The matter proceeded to a bench trial on May 1, 2024.

{¶ 3} The facts of the case are largely undisputed. The following is a summary of the testimony and evidence presented at trial.

{¶ 4} Julep was a bar located on North High Street, in Franklin County, Ohio, within the Short North Arts District ("Short North"). The establishment maintained a fenced-in patio where patrons could drink and socialize outside. In 2022, local authorities were having issues with individuals congregating on the sidewalk outside of the patio. These individuals would frequently interact with the customers on Julep's patio, sometimes sharing alcoholic beverages back-and-forth. To keep foot traffic moving in front of Julep, officers from the Columbus Division of Police ("CPD") would be on the lookout for groups gathering on the sidewalk outside of the patio. Furthermore, Julep security personnel were instructed to prevent people from the street from interacting with customers on the patio.

{¶ 5} In the early morning hours of September 5, 2022, G.C. was walking up North High Street. As he passed Julep, he stopped and began speaking to two individuals later identified as Ashley Fisher and LeAnna Doyle. As this occurred, Foster, Dwayne Cummings, Quintin White, and Andre Turner were seated nearby at Julep's front door. Foster, Fisher's fiancé, was working security at Julep. He approached G.C. and told him that he needed to keep walking up the street or come inside the bar. A verbal dispute between the two men ensued.

{¶ 6} The incident was captured on Julep's exterior security camera (State's Ex. EE-2), as well as a video recorded and posted to Facebook (State's Ex. C-2) by an unnamed individual. During the confrontation, Foster began walking north on North High Street, away from Julep, but G.C. followed him. (State's Ex. EE-2 at 0:48-0:50.) The two men faced each other and took up fighting stances with fists raised. (State's Ex. EE-2 at 0:53-1:07.) As the two men moved around in a state of mutual combat, Cummings can be seen in the background removing and setting aside a bag he was carrying. G.C. and Foster never threw punches at each other and at one point, G.C. lowered his hands. With G.C. still looking in Foster's direction, Cummings approached from his blindside and threw a single punch, striking G.C. in the face. (State's Ex. EE-2 at 1:07; State's Ex. C-2 at 0:00.) G.C. was knocked unconscious. He fell partially into the street, unable to brace his fall.

{¶ 7} As G.C. lay in the street unresponsive, Foster stood over him pointing and yelling at him. (State's Ex. EE-2 at 1:10; State's Ex. C-2 at 0:01.) As he stood over him,

Foster delivered three strikes to G.C.'s head and neck area. (State's Ex. EE-2 at 1:11-1:15; State's Ex. C-2 at 0:03-0:06.) After the third strike, Foster walked away and Cummings began standing over G.C. (State's Ex. EE-2 at 1:16; State's Ex. C-2 at 0:07.) Cummings delivered one final blow to G.C.'s head before walking away. (State's Ex. C-2 at 0:12.)

{¶ 8} Witness Zoie Clark testified that, in the early morning hours of September 5, 2022, she went with her boyfriend to the Short North. They parked across the street from Julep. They stopped by a bench along North High Street to talk to an acquaintance. As they did so, she observed G.C. laying in the road across the street. She was unaware at the time, but she later recalled that she had previously met G.C. He was a bartender at another local bar. She did not see what caused G.C. to fall to the ground. As G.C. lay there, an individual in black, later identified as Foster, struck G.C. with a forceful punch. As Foster struck G.C., Clark heard him say something to the effect of "this is my city" and "this is what you get." (May 1, 2024 Tr. Vol. 1 at 64-65.) The group of people gathered around G.C. dispersed and Clark walked across the street to where G.C. was laying. G.C. had injuries to his face and was unconscious. That is when police officers arrived on the scene.

{¶ 9} CPD officers Nicholas Geno and Cody Banks were driving north on North High Street. As they passed Julep, they observed G.C. laying partially in the street with a group of people around him. They called for medics and officer Banks began to perform first aid on G.C. Officer Banks did not move him because he was unsure of the severity of G.C.'s head and/or neck injury, and he did not want to exacerbate it. G.C. had blood and clear fluid coming from his ear, so officer Banks stabilized his head and put pressure on where he believed the wound was to prevent further bleeding. G.C. was unresponsive with labored breathing. As officer Banks performed first aid, officer Geno looked for witnesses. He was unable to locate any cooperative witnesses. He entered Julep and inquired about security video, but no one there could help him. Officers Geno and Banks assisted G.C. into the ambulance, secured the scene, and then waited for detectives from the felony assault unit to arrive.

{¶ 10} Detective Jason Gunther of CPD's Felony Assault Unit was called out to Julep on September 5, 2022. Once at the scene, detective Gunther took some pictures. There were no witnesses at the scene, and nobody was at the bar to provide security video. He left the scene and responded to the hospital to check on G.C. A nurse informed him that G.C.

was in critical condition. He would make it through the night, but they were going to do surgery to release the pressure on his brain. When he came back on duty that evening, detective Gunther responded to the hospital to check on G.C. He was informed that G.C. was on a ventilator and would not survive. Detective Gunther responded back to Julep and was able to view security camera footage of the incident. He contacted the CPD's Homicide Unit because G.C. was not going to survive. Detective Anthony Johnson became the lead detective and retrieved copies of the Julep security video on September 6, 2022.

{¶ 11} As part of the investigation, detective Sean Taylor of CPD's Digital Forensics Unit converted video from Julep that could be played through Windows Media Player. He also created a sub-clip of the video that showed the incident in question. Detective Taylor then extracted frames from both the Julep video and Facebook video. In his opinion, the videos did not appear to be edited or tampered with in any way.

{¶ 12} G.C. never regained consciousness and passed away on September 18, 2022.

{¶ 13} Dr. Michael Caplan, a Forensic Pathologist with the Franklin County Office of the Coroner, performed an autopsy of G.C. on September 19, 2022. As part of the autopsy, Dr. Caplan reviewed G.C.'s medical records from the hospital. Numerous injuries were observed to G.C.'s head and neck. There was a four-by-two-inch area of bruising on the left side of the scalp. In the back of G.C.'s scalp, Dr. Caplan located a two-and-a-half by one-and-a-quarter-inch bruise. There was bleeding on the right side of the scalp. However, this is where doctors performed a craniectomy, a procedure designed to relieve pressure on the brain by removing a section of the patient's skull. Thus, Dr. Caplan was unable to differentiate between bruising in that area and bleeding from the craniectomy. G.C. also sustained a fracture to the base of his skull. Dr. Caplan attributed this injury to G.C. falling backward and striking his head on concrete.

{¶ 14} Dr. Caplan observed bleeding between the brain and the dura, the covering of the brain, on the top of the right side of G.C.'s head. This bleeding was causing pressure on G.C.'s brain, making the craniectomy necessary. G.C. also had a healing subdural hemorrhage on the right side of his falx cerebri. It was healing because he survived for nearly two weeks after the injury. There was a subarachnoid hemorrhage causing blood to collect on the top, right side of the brain, as well as the bottom of the brain. The arachnoid is a delicate membrane that covers the brain. It has many small blood vessels, which

frequently bleed due to head trauma. G.C. also had multiple contusions to the brain. These were in the frontal lobes and the deep structures of the brain. Dr. Caplan opined that the contusions to the front part of the brain were also caused by G.C.'s head striking the ground. There was also bruising to the inner parts of the brain and the brain stem. These injuries were likely caused by a significant force that put G.C.'s brain into acceleration and rotation.

{¶ 15} G.C. also had brain swelling of the right cerebral hemisphere. Dr. Caplan explained that the brain can swell due to trauma, lack of oxygen, and/or increased pressure. When this occurs, the brain essentially attempts to escape the skull by moving across the open margin of the dura. This, in turn, puts pressure on some of the arteries supplying blood to the brain, causing hemorrhages in the brain stem.

{¶ 16} When he was admitted to the hospital, G.C. had a blood alcohol concentration of 0.157 grams per deciliter. Although alcohol can exacerbate the effects of bleeding inside of the head, Dr. Caplan did not believe alcohol contributed to G.C.'s death. Dr. Caplan also noted that G.C. had high blood pressure, an enlarged heart, and hardening of his arteries. However, these did not contribute to his death.

{¶ 17} Dr. Caplan testified that he reviewed the video of the incident, and he observed that the strikes by Foster rotated G.C.'s head. (Tr. Vol. I at 132.) In his opinion, that acceleration and rotational force could cause some of the injuries he observed during the autopsy. The initial punch by Cummings also caused the brain to be accelerated and rotated. Other than the skull fracture and the contusions to the front of the brain, Dr. Caplan could not attribute any of the specific injuries to any of the strikes to G.C.'s head. *Id.* at 128, 167. This was because injuries in the brain do not necessarily correspond to a specific impact site. Dr. Caplan opined:

> [I]t was the sum or the totality of the blunt impacts to [G.C.'s] head and face, including the punch of the blow [sic] to the right side of his face, the impact of the back of his head with the ground, and the subsequent four strikes to his head while he lay on the ground, which was responsible for the brain injuries that initiated the events that ultimately led to his death.

*Id.* at 167.

Dr. Caplan testified that the strikes by Foster "would have contributed to the overall effect of the brain injuries and the complications of those brain injuries." *Id.* at 163. He further opined that each one of the "impacts had the potential to cause fatal brain injury." *Id.* at

On cross-examination, Dr. Caplan testified that the initial punch by Cummings and G.C.'s fall to the pavement were potentially fatal injuries. Ultimately, Dr. Caplan ruled G.C.'s cause of death as complications of blunt impact to the head and that the manner of death was homicide.

{¶ 18} The defense presented the testimony of Foster's then fiancé, Ashley Fisher. Fisher testified that she went to Julep to meet Foster, Cummings, Doyle, and White. Fisher indicated that she previously worked security for Julep and part of her duties were to keep passersby away from the patio area. As she and Doyle sat on the Julep patio, G.C. approached them from the sidewalk and said something to Fisher. G.C. and Doyle began to go back-and-forth. Foster, who was sitting nearby, intervened and told G.C. he needed to keep walking or come into the bar. Fisher testified that G.C. said that he was a "big money baller from Chicago" and that "he could f*** people up." (May 2, 2024 Tr. Vol. II at 222.) Turner, Foster's boss, got in between the two and told Foster to walk up the street one way and G.C. to walk the other way. G.C. pushed past Turner and told Foster to fight for his girl. She testified that G.C. was told to walk away approximately ten times.

{¶ 19} The parties stipulated to the following: the identity of the deceased as G.C.; the authenticity of the Facebook video of the incident; the authenticity of the Julep security video; and to the identities of Foster and Cummings. Foster made Crim.R. 29 motions for acquittal at the end of the state's case, after his case, and again after closing arguments. Those motions were denied. After deliberating, the trial court found Foster guilty of felony murder. Subsequently, the trial court sentenced Foster to 15 years to life in prison.

{¶ 20} Foster now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 21} Appellant assigns the following as trial court errors:

> [1.] The trial court erred when it denied the defense's motion for acquittal pursuant to Crim. R. 29 and convicted Mr. Foster upon insufficient evidence in violation of Mr. Foster's rights under *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); Fifth, Sixth and Fourteenth Amendments of the United States Constitution; Section 10, Article I, of the Ohio Constitution.
>
> [2.] Counsel for Mr. Foster provided ineffective assistance of counsel by failing to retain an expert to contest and challenge the testimony of the coroner, Dr. Caplan, when the only

evidence supporting the conviction was provided by the State's expert. Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution.

[3.] The trial Court erred in concluding that Mr. Foster committed a felony (Felonious Assault) and thereby rejected the lesser included offense of Involuntary Manslaughter, when Mr. Foster's actual conduct only supported a misdemeanor offense (Simple Assault).

## III. STANDARD OF REVIEW

{¶ 22} A sufficiency of the evidence challenge examines "whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 2018-Ohio-3942, ¶ 15 (10th Dist.). The test for sufficiency is whether the prosecution has met its burden of production at trial, and is a question of law, not fact. *State v. Boles*, 2013-Ohio-5202, ¶ 34 (12th Dist.). An appellate court's standard of review for sufficiency of the evidence " 'is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Smith*, 80 Ohio St.3d 89, 113 (1997), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The testimony of one witness, if believed by the trier of fact, is enough to support a conviction. *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.).

{¶ 23} In considering a claim of ineffective assistance of counsel, this court applies a two-part standard. *State v. Rhoades*, 2020-Ohio-2688, ¶ 42 (10th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). First, a defendant must demonstrate that counsel's performance was deficient. *Id.* "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687. To satisfy this prong, the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* A defendant's claim of deficient performance must overcome the strong presumption that a licensed attorney's performance fell within the wide range of reasonable professional assistance. *State v. Diallo*, 2025-Ohio-920, ¶ 28 (10th Dist.). "Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 2006-Ohio-6207, ¶ 116. In the second prong, a defendant must demonstrate that counsel's deficient performance was

prejudicial. *State v. Pardon*, 2022-Ohio-663, ¶ 36 (10th Dist.). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

## IV. LEGAL ANALYSIS

{¶ 24} Because Foster's first and third assignments of error are related, we will address them together. In his first assignment of error, Foster contends that his conviction was not supported by sufficient evidence. In his third assignment of error, Foster contends that the trial court erred in rejecting the lesser-included offense of involuntary manslaughter. It should be noted that although the state addresses the manifest weight of the evidence, Foster did not raise a manifest weight of the evidence challenge here. As such, we will limit our discussion to the sufficiency of the evidence. *State v. Taurus Darson*, 2010-Ohio-5713, ¶ 34 (10th Dist.). Foster was convicted of murder, a violation of R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 25} Foster was convicted of felony murder by way of causing the death of G.C. as a proximate result of committing felonious assault. It should be noted that felonious assault is an offense of violence and a felony of the second degree. R.C. 2901.01(A)(9)(a); R.C. 2913.11(D)(1)(a). R.C. 2903.11(A)(1) states: "No person shall knowingly . . . [c]ause serious physical harm to another or to another's unborn." A person acts "knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Serious physical harm to persons" is defined, in part, in R.C. 2901.01(A)(5)(b) and (c) as "[a]ny physical harm that carries a substantial risk of death;" and/or "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity."

{¶ 26} Foster contends that there is insufficient evidence to support the theory that he was complicit in causing G.C.'s death. (Appellant's Brief at 8.) R.C. 2923.03(A)(2)

defines complicity, in part, as "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: . . . [a]id or abet another in committing the offense." R.C. 2923.03(F) states that an accomplice "shall be prosecuted and punished as if he were a principal offender" and "[a] charge of complicity may be stated . . . in terms of the principal offense." Complicity is implied in every criminal indictment. *See*, *e.g.*, *State v. Herring*, 94 Ohio St.3d 246, 251 (2002). Unlike conspiracy, complicity does not require a tacit understanding to commit an offense, but the defendant may be an aider and abettor in the commission of the offense. *See State v. McFarland*, 2020-Ohio-3343, ¶ 26-29. In this case, the evidence at trial was sufficient to support a conviction based on Foster's participation and complicity in the felony murder of G.C.

{¶ 27} To prove that a defendant aided or abetted another in the commission of a criminal offense, the state must produce evidence showing "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001). "The mere presence of an accused at the scene of a crime is not sufficient to prove . . . that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). "A common purpose among persons to commit a crime need not be shown by positive evidence but may be inferred from circumstances surrounding the act and from the defendant's subsequent conduct." *State v. Agee*, 2021-Ohio-489, ¶ 42 (10th Dist.). "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971.)

{¶ 28} Based on the evidence presented, the circumstances surrounding the incident give rise to the inference that Foster and Cummings shared a common purpose in assaulting G.C. The videos in this matter demonstrate that the conduct of Foster and Cummings are inextricably linked. Just prior to encountering G.C., the two were sitting together at Julep's door. Although Cummings was not working that night, the two were employed by the same individual to provide security services to local bars. In the Julep security video, as G.C. and Foster are squaring up, Cummings can be seen removing a bag he was wearing, as if to prepare to engage in the fight. (State's Ex. EE-2 at 0:53–1:07.) The assault, itself, takes approximately 15 seconds. In that short time span, Cummings knocks G.C. unconscious,

Foster stands over G.C., Foster strikes G.C. three more times, Cummings stands over G.C., and Cummings strikes G.C. one final time. Clark testified that as Foster stood over G.C., he was yelling something like "this is my city" and "this is what you get." (Tr. Vol. 1 at 64-65.) Furthermore, there is no evidence that Foster and Cummings had independent motives to assault G.C. *See State v. Miller*, 2025-Ohio-197, ¶ 19 (2d Dist.).

{¶ 29} Foster also contends that his conviction is not supported by sufficient evidence because Dr. Caplan could not attribute any of G.C.'s injuries to the strikes delivered by Foster. (Appellant's Brief at 8.) However, Dr. Caplan testified that Foster's strikes "would have contributed to the overall effect of the brain injuries and the complications of those brain injuries, which would include swelling, lack of oxygen and ultimately increased pressure inside the head." (Tr. Vol I at 163.) Moreover, several Ohio courts, including this one, have found defendants' convictions supported by sufficient evidence where, even though no injuries could be specifically attributed to the defendants' conduct, the defendants were actively participating in the assault that resulted in serious physical harm. *See State v. Husband*, 2003-Ohio-2279, ¶ 43 (10th Dist.) (sufficient evidence supported a conviction for complicity to felonious assault where defendant repeatedly kicked the victim after the victim was rendered unconscious by another individual); *see also State v. Colvin*, 2012-Ohio-4914, ¶ 3, 14 (9th Dist.) (conviction for felony murder supported by sufficient evidence despite no evidence that the defendant delivered the fatal blow or even struck the victim in the head); *see also State v. Montgomery*, 2024-Ohio-2520, ¶ 41-43 (3d Dist.) (sufficient evidence to support a complicity to felony murder conviction where evidence showed defendant kicked and punched the victim in the head after the victim had already been severely beaten by other individuals).

{¶ 30} In fact, this case is very similar to the case in *Miller* at ¶ 18-19. In *Miller*, the defendant and co-defendant arrived at the scene together. *Id*. at ¶ 6. As the two approached the victim, the defendant followed a few steps behind the co-defendant. *Id*. The co-defendant threw a single punch, knocking the victim unconscious. *Id*. at ¶ 18. After the victim was knocked unconscious, the defendant stood over the victim, yelled "represent," then punched the victim in the face. *Id*. In finding that the defendant's conviction for complicity to felonious assault was supported by sufficient evidence, the Second District

noted in *Miller* that a reasonable mind could have inferred that the defendant was aware that the co-defendant had caused the victim serious physical harm when the defendant stood over the clearly unconscious victim. *Id.* at ¶ 19. Moreover, it was reasonable to infer that the two were acting in concert because there was no evidence that they had independent motives to assault the victim. *Id.*

**{¶ 31}** The case at hand is similar to the case in *Miller*, for several reasons. First, Foster and Cummings were together immediately preceding the assault. Second, immediately following the knockout punch by Cummings, Foster stood over G.C. taunting and yelling at him. As he did so, he struck G.C. in the head. Lastly, there was no evidence that Foster and Cummings had independent motives to assault G.C. This case is arguably more compelling than the case in *Miller*. Here, there was evidence that Foster and Cummings worked for the same person providing security services for local bars. Furthermore, in *Miller*, the defendant threw a single punch after the victim was unconscious before he and the co-defendant left the scene. Here, Foster struck G.C. three times and Cummings returned to deliver a final blow in rapid succession.

**{¶ 32}** Foster further contends that the trial court erred in finding that G.C.'s death was the proximate result of Foster's conduct. In the context of felony murder, Ohio courts have stated:

> "[I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience."

*State v. Ford*, 2008-Ohio-4373, ¶ 31 (10th Dist.), quoting *State v. Dixon*, 2002 Ohio App. LEXIS 472, *14 (2d Dist. Feb. 8, 2002). Dr. Caplan testified that it was his opinion that "it was the sum or the totality of the blunt impacts to [G.C.'s] head and face . . . which was responsible for the brain injuries that initiated the events that ultimately led to his death." (Tr. Vol. I at 167.) The video shows that the strikes delivered by Foster were not simple

slaps, but forceful impacts to G.C.'s head and neck area. On at least one of the strikes, Foster can be seen winding up before following through. (State's Ex. C-2 at 0:03–0:06.) It was reasonable to infer that Foster was aware Cummings had caused serious physical harm to G.C. when Foster was standing over G.C. as he lay on the ground unconscious. *Miller* at ¶ 19. In sum, G.C.'s death was a reasonably foreseeable consequence of Foster's active participation in the assault. *Colvin*, 2012-Ohio-4914, at ¶ 14 (9th Dist.).

**{¶ 33}** Based on the foregoing, viewing the evidence and all reasonable inferences in a light most favorable to the prosecution, Foster's conviction for felony murder as a proximate cause of committing complicity to felonious assault was supported by sufficient evidence. Furthermore, a finding that Foster's conviction to the charge in the indictment is supported by sufficient evidence necessitates a finding that the trial court did not err in rejecting the lesser-included offense of involuntary manslaughter. *See State v. Herrera*, 2006-Ohio-3053, ¶ 93 (6th Dist.) (rejecting appellant's request to be convicted of a lesser-included offense where the trial court found sufficient evidence supported his convictions of the crimes charged); *see also State v. Rutledge*, 2019-Ohio-3460, ¶ 28 (10th Dist.) (finding no error where the jury was instructed on a lesser-included offense but chose to convict the defendant as charged in the indictment).

**{¶ 34}** Based on the foregoing, we overrule Foster's first and third assignments of error.

**{¶ 35}** In his second assignment of error, Foster asserts that he received ineffective assistance of counsel due to trial counsel's failure to call an expert witness to rebut Dr. Caplan's testimony. "The decision whether to call a witness is generally a matter of trial strategy and, absent a showing of prejudice, does not deprive a defendant of effective assistance of counsel." *State v. Samatar*, 2003-Ohio-1639, ¶ 90 (10th Dist.). Furthermore, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993). In many criminal cases, deciding not to call an expert witness "is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant." *State v. Glover*, 2002-Ohio-6392, ¶ 25 (12th Dist.).

**{¶ 36}** Foster argues that it was ineffective assistance of counsel not to call an expert to rebut Dr. Caplan's testimony because this was a "pure causation" case, and Dr. Caplan's

"testimony was the only evidence that connected Mr. Foster's actions to . . . [G.C.]'s death." (Appellant's Brief at 23.) However, Foster assumes that there is, in fact, an expert out there who could rebut Dr. Caplan's testimony. Foster fails to point to anything in the record identifying a potential expert witness or what that expert would have opined. Where a claim of ineffective assistance of counsel relies on facts outside of the record, such an argument "must fail." *State v. Washington*, 2007-Ohio-3212, ¶ 28 (10th Dist.). "Arguments of ineffectiveness for failure to obtain expert witnesses have been rejected where there is a failure to identify which expert witnesses should have been called or what they would have said, since such an argument is merely speculative." *State v. Klotz*, 2024-Ohio-2864, ¶ 21 (11th Dist.).

{¶ 37} Foster further contends that it was ineffective assistance of counsel to not call an expert witness because "an expert employed by the defense could not 'further inculpate' Mr. Foster." (Appellant's Brief at 22.) Dr. Caplan testified that he could not attribute any specific injury to any of the strikes G.C. received, except the skull fracture, which was caused by his head striking the ground. Thus, Foster's hypothetical expert witness could, in fact, further inculpate Foster by opining that certain brain injuries were attributable to Foster's strikes. This further demonstrates that Foster's claim of ineffective assistance of counsel based on a failure to call an expert witness is based on pure speculation. On the record before us, we cannot say that counsel performed deficiently. Furthermore, even if it could be said that counsel's performance was deficient, Foster has failed to demonstrate that he was prejudiced by counsel's decision.

{¶ 38} Based on the foregoing, we overrule Foster's second assignment of error.

## V. CONCLUSION

{¶ 39} Having overruled each of Foster's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

MENTEL and DINGUS, JJ., concur.

————————————